STATE OF IOWA, appellee, v. ELDON E. FRANKLIN, appellant.

No. 47622.

(Reported in 46 N.W.2d 710)

March 6, 1951.

Rehearing Denied May 11, 1951.

Welch & Welch, of Logan, for appellant.

Robert L. Larson, Attorney General, Don Hise, First Assistant Attorney General, and Michael Murray, of Logan, County Attorney, for appellee.

BLISS, J.—The defendant, forty-eight years old at the time of the trial, with his wife and two children, had his home south of the railroad tracks in the city of Missouri Valley, Iowa, at which location he operated a cafe and a service station and truck stop. His home and place of business were adjacent to the Boyer River, which emptied into the Missouri River about seven miles distant. On March 5, 1949, there was an ice jam at the mouth of the Boyer River which caused its waters to back up and overflow an extensive expanse of territory driving many people from their homes. In defendant's home the water was twenty-eight inches above the floor, and in the cafe and oil station it was forty-nine inches higher than the floors, and remained there for about six days. On March 11 it was still muddy in spots back of his place of business. For a time a boat was necessary in going to and from his buildings. Some of his electric equipment had to be taken to Council Bluffs and Omaha to be reconditioned. He left home in his 1948 Dodge automobile to make such a trip about eleven o'clock in the forenoon of March 11. He left Omaha for the return trip about 8:45 o'clock in the evening and stopped at the music store of Mr. Stivers in Council Bluffs to purchase some records for his music box. He testified that he drank no intoxicating liquors at any time on March 11. Leaving Council Bluffs, which is about twenty-five miles south of Missouri Valley, he testified that he drove north on the paved highway at a speed of sixty or seventy miles an hour, and as he approached the south end of the bridge over the Boyer River, with the dimmers on, just below Missouri Valley a truck with dimmed headlights was

coming south across the bridge and as it came down the incline from the bridge its lights lowered and blinded him. As it passed, he, for the first time, saw a car parked on the east shoulder and partly on the paving, which he said he was unable to avoid, and the right front corner of his car struck the rear left corner of the parked car. The right knee of the steering apparatus of his car was disabled so that he was unable to guide his car, and after going north across the bridge, to avoid approaching traffic he turned his car to the right into the ditch and came to a stop upright among some ice cakes in the river bottom.

The car which was struck by defendant's car was a 1929 Model A Ford car being driven by Levi Graham of Omaha, who was proceeding, with his wife and two children and a nineteen-year-old boy named John Spickler, to Denison, Iowa. The lights of the car had not been working well, and that was the reason for their stopping. Arthur Lewis, an Omaha truck driver, testified that he left Missouri Valley for Council Bluffs about nine p.m. and as he approached the bridge he saw an Allied Van Lines truck ahead of him about six hundred feet and saw its stop light as the truck started to slow down, and then a car came from the south around the truck weaving back and forth across the road several times; that he (Lewis), fearing a collision, stopped his truck, and the approaching car went into the ditch on the east side of the road before it reached him, about one hundred fifty or two hundred feet north of the bridge; that he left his truck and saw a man get out of the driver's side of the car in the ditch and start toward the highway; that he got out of his truck and helped the man up the bank, and when he asked him if he was hurt he said he did not think he was; at his request, he went down and turned off the lights in the car and saw various articles in the car; when he returned, the man, who said his name was Franklin, was in the truck, where they both sat for about ten or fifteen minutes until peace officers—four of them—began to arrive; one of the policemen opened the truck door and Franklin stuck out a carton of cigarettes to the policeman and asked him if he wanted a drink; he noticed the odor of alcohol on his breath, and when he left the truck he observed that his trousers were wet in the crotch and the cushion was wet and there was an odor of urine in the cab; his voice was quite thick, but he did not base his opinion on

the clearness of his speech, but on his actions and on the strong smell of liquor on his breath; he did not get out of the truck until the peace officers arrived, and just before they came he had moved his truck farther south.

The first officers to arrive were Don Conaway, the Chief of Police of Missouri Valley, and Hugh Fry, a special policeman. Conaway testified that a call came through his station reporting an accident around 9:30 p.m., and when they reached the disabled Ford car they found the defendant in the Lewis truck. Highway Patrolman Sober arrived about this time, about ten or fifteen minutes after the accident, and he and defendant went across the ditch to examine defendant's car, which Sober said was in a field about five hundred feet north of the north end of the bridge. Franklin told Sober the car was his and that he had been driving it. In the car were sugar and other articles. Observing a strong odor of alcohol, Sober asked defendant if he had been drinking, and defendant replied, "A couple, yeah." Upon defendant's refusal to go with Sober to report at the city hall, Sober arrested him for drunkenness and took him to the city hall in Missouri Valley.

Patrolman Drustrup, who had sent Sober to the scene of the accident after receiving a call, later and shortly after ten p.m., accompanied by Conaway, was going out to the bridge when they met Sober returning with the defendant, and they turned back to the city hall, where Sober, Conaway, Drustrup, and Fry spent about forty-five minutes with the defendant. Graham and Spickler were also there. Drustrup testified that according to his information the collision occurred about 9:30 p.m. The officers were witnesses for the State and each testified: that the defendant was quarrelsome and belligerent in his actions toward them, his voice loud and his language profane, vile, insulting, and threatening; his speech slurred and confused; his face flushed, his eyes watery and bloodshot, his breath odorous of intoxicating liquor, and he staggered and was unsteady on his feet; and his trousers were wet in the crotch. Each of these officers had been engaged in his work for a number of years and had much experience with intoxicated persons. Each testified that in his opinion Franklin was intoxicated during the time they were with him. While in the city hall he used abusive language toward Mr. Graham.

Young Mr. Spickler, speaking of Franklin, testified: "His eyes seemed to be red, his face and complexion was kind of dark, and he kind of wobbled around now and then. I didn't see any cuts or bruises or marks from the accident. As far as I can tell you, all I heard him say is that he was ready to whip anybody that wanted to try to whip him."

Drustrup testified: "We questioned Franklin as to whether he had been drinking or not. Sometimes he said he had and sometimes he told me he hadn't [and answered] 'So what if I want to drink; it's my business.' * * * We asked him if he wanted a blood test, and he said: 'I'm too damn smart to take one of those,' and he said he didn't want anything to do with that." Drustrup said that in his opinion "Franklin was very intoxicated." Patrolman Sober testified: "I mentioned a urine test. Franklin's answer to that was 'I wouldn't——in the jug for you or anybody else'."

Vic Miller, who was engaged in the wrecker service, testified that he saw the defendant at the city hall and asked him about bringing in his car and he gave him permission. He heard him talk to the peace officers with considerable profanity, and said that his eyes were bloodshot and he had "a wobbliness and un-balance to his walk", and that he appeared "to be very intoxicated."

Sheriff Bullis testified that when defendant was brought to the jail at Logan about 10:30 or 10:45 p.m. on March 11 he was unsteady on his feet, the odor of liquor was on his breath, his tongue was thick and he did a lot of stuttering, his face was flushed, his eyes were red, watery and bloodshot, and "he was mad at everything." It was his opinion that he was intoxicated at that time.

Defendant's motion for a directed verdict at the close of the State's case was on the ground that there was "an entire failure of evidence on the part of the State to show that defendant had used any intoxicating liquor or was intoxicated prior to the time of the collision with the Graham car." The motion was denied.

As a witness for himself, defendant, in addition to matters set out in the beginning of this opinion describing the high water and his return from Omaha, confirmed much of the testimony of Lewis and the officers. He admitted he became irritated and "pretty mad" at the officers, and gave them much trouble that

night. He admitted that his clothes were soiled, but not from urine, and that because of the flood he had not had a change of clothing, since practically all of his clothes were ruined. He denied that he was intoxicated or had drunk anything intoxicating on March 11, 1949. It appeared from the testimony of the defense that defendant was taken by Patrolmen Sober and Drustrup from Missouri Valley to the county jail at Logan, and that Sheriff Bullis was awakened and Attorneys W. P. Welch and son and the county attorney were called to the jail. Mrs. Franklin also accompanied her husband and those who had him in custody. About 11:45 p.m. or later, Mr. Welch Sr. suggested to the sheriff and the county attorney, the defendant and his wife and Mr. Johnson and Mr. Linder (friends of the defendant who had called) that they all hold "a breath-smelling bee" with the defendant as the breather. The defense contended that the "bee" was a little earlier but the patrolmen testified that they reached the jail about 11:35 or 11:45 p.m. and that the attorneys came a little later. The county attorney protested somewhat because the "bee" was taking place too long after the collision to be of any help, and that besides he had a cold. Mr. A. C. Johnson, witness for defendant, a salesman for Cook's Paint in Omaha, had known defendant for five or six years. He testified: "I observed him and talked to him, and that was about 11:30 p.m. When I saw him he was absolutely sober and there was no sign or smell of any intoxicating liquor on him. The time was in the vicinity of eleven-thirty or twelve o'clock." Questioned by W. P. Welch on redirect examination, Mr. Johnson testified: "In the corridor of the jail I saw Mr. Bullis, Mr. Murray, John Linder, and another gentleman that I did not know, and your son Bill, and at that time there was a breath-smelling bee and the different ones went over and smelled of Franklin's breath and had him blow. Mr. Miller had him blow and Mr. Bullis had him blow and William Welch, senior, and Bill had him blow. I mean old Bill and young Bill. I did not hear any announcement after the different ones smelled him as to whether or not there was any odor of liquor on Franklin."

John Linder, who operated a Skelly oil station on the defendant's property, testified for defendant that he saw him sometime before twelve o'clock midnight in the Logan jail: "I had found

out that he had some difficulties, and we [Mr. Johnson and he] wondered if we might be able to help him * * *. I talked with him and looked at him and there was no discoloration about his trousers. He was sober and I would qualify that statement by saying that I did not think he had had a drink. * * * Mr. Murray, who sits on the other side of the table, came in and smelled his breath at that time, and after he had smelled it I do not remember his exact words, but it was a negative answer."

Mrs. Franklin testified that she and Bill Welch, Sr. and Jr., and Mr. Morrow all smelled and could smell nothing, and that Mr. Murray smelled and said: "No, I couldn't say that you were drinking." The defendant also testified that Mr. Murray said that he could smell nothing. Mr. Murray was prosecuting the case alone, and was cross-examining the defense witnesses, and properly did not testify.

Mr. Bullis, testifying for the State, was cross-examined by W. P. Welch, and said: "Mr. William P. Welch arrived with his son, W. H. Welch, who is his partner, and he also arrived with Pat Morrow, lawyer from Onawa. We all leaned over and had Franklin blow his breath in our faces so that we could smell. I smelled a little and William P. Welch said, 'I smelled also and I cannot smell any liquor on his breath.' I laughed when you said you couldn't smell liquor on his breath. I do not know whether I was there when you asked Mr. Murray to lean over to see if he could smell liquor on his breath. * * * I do not know whether Mr. Murray could smell or not but I know I could and I know when I can smell liquor and when I can't smell liquor. I heard you say you couldn't smell liquor on his breath but naturally you would say that."

Richard L. Stivers has a music shop in Council Bluffs and was acquainted with defendant for about six years. As a witness he said Franklin had been in his shop between seven-thirty and eight o'clock on the evening of March 11, 1949, and left it between eight-thirty and nine o'clock. "I talked with him and observed his appearance. There was nothing unusual or out of the ordinary about him and I did not smell any intoxicating liquor upon him, and I would not say that he had been drinking at all, and he was as sober as I have ever seen him."

Defendant contended that his difficulty in speaking, which

some of the State's witnesses referred to, was because he had his teeth extracted sometime before March 11, 1949. It was stipulated by the parties that if defendant's dentist were called as a witness he would testify that he completed extraction of all of the teeth of defendant on February 10, 1949, and that he did not complete his plates or dentures until after March 11, 1949.

Defendant renewed his motion to direct at the close of all of the evidence. It was overruled. His later motions in arrest of judgment and for new trial were overruled.

I. Defendant assigns error in the overruling of each of these motions, because, as he argues, the evidence was insufficient to sustain a conviction.

The State's evidence established that defendant was operating a motor vehicle on a public highway in Harrison County, Iowa. The defendant told Sober that this was true. The only element of the crime in controversy is the fact of his intoxication. One of the State's witnesses saw the defendant when he went into the ditch while driving the car, and helped him up the bank and then was with him in the cab of the witness's truck for ten or fifteen minutes, and testified to indications of his intoxication. Three peace officers arrived at this time and observed his condition and then took him to the city hall where these officers and an additional officer and Mr. Miller, who brought defendant's car to Missouri Valley, observed his conduct, condition and appearance for some time, and all of them testified to these matters and gave their opinion that he was intoxicated. Spickler also testified to his condition. The sheriff saw defendant about eleven o'clock that night at Logan. He testified that in his opinion the defendant was then intoxicated. Certainly this evidence tends to establish the issue of intoxication.

The fact that two witnesses for the defendant, who saw him about midnight, and defendant's wife, who saw defendant in Missouri Valley and later at Logan, testified that they thought he was sober then, and certain others said they could smell no liquor on him at Logan, did not make the issue of intoxication one of law for the court requiring it to direct the jury to return a verdict of not guilty. The evidence was in conflict and the issue of intoxication was for the jury, and since there was substantial evidence to sustain its finding of intoxication the verdict of the

jury and the judgment entered thereon is final and is binding on this court. State v. Ferguson, 233 Iowa 354, 359, 6 N.W.2d 856; State v. Crandall, 227 Iowa 311, 318, 288 N.W. 85; State v. Harrington, 220 Iowa 1116, 1123–1124, 264 N.W. 24; State v. Manly, 211 Iowa 1043, 1046, 233 N.W. 110; State v. De Kraai, 224 Iowa 464, 466, 276 N.W. 11; State v. Lowe, 235 Iowa 274, 276, 16 N.W.2d 226; State v. Werling, 234 Iowa 1109, 1112, 13 N.W.2d 318; State v. Lowenberg, 216 Iowa 222, 227, 243 N.W. 538; State v. McDowell, 228 Iowa 180–185, 290 N.W. 65; State v. Kendall, 200 Iowa 483, 488, 489, 203 N.W. 806; State v. Pearce, 231 Iowa 443–445, 1 N.W.2d 621; State v. Boyle, 230 Iowa 305, 306, 297 N.W. 312; State v. Gillman, 202 Iowa 428, 429, 210 N.W. 435; State v. Jenkins, 203 Iowa 251–254, 212 N.W. 475; State v. Lorey, 197 Iowa 552–554, 197 N.W. 446; State v. Morkrid, Iowa, 286 N.W. 412, 413.

As said in State v. Lowenberg, supra, 216 Iowa 222, 227: "It is peculiarly the province of the jury to pass upon questions of fact. Reversal upon the ground of the insufficiency of the evidence to justify a conviction will follow only where the evidence to support the verdict is so utterly wanting that it cannot be sustained."

While there was testimony that defendant was not intoxicated when he collided with the Graham car the evidence of the State to the contrary clearly preponderates that of defendant. The trial court rightly ruled upon each motion.

There is no merit to defendant's contention that the witnesses for the State had no opportunity to know whether defendant was intoxicated prior to the collision. It was, of course, not necessary that they should actually see him drink. But Lewis saw him come across the bridge in his car and go into the ditch. He helped him up the bank and stayed with him for ten or fifteen minutes thereafter. Lewis tried to get him to go and see the occupants of the Graham car, but he said there was no hurry. Within fifteen minutes after defendant came out of the ditch, Conaway and Fry and Sober took charge of defendant and he was taken to the city hall where Drustrup, Miller and Spickler observed him. There was no evidence of any liquor in his car and he had no opportunity to drink while he was with the officers. His intoxication, if any, was the result of drinking before he

came under the observation of Lewis. There was no break in this observation from the time of the collision with the Graham car until he was lodged in the Logan jail. The observation of defendant was more prompt, close and continuous than in any of the driving-while-intoxicated cases cited above, and in each of them the issue of intoxication was given to the jury. Defendant has cited State v. Hamer, 223 Iowa 1129, 274 N.W. 885; State v. Wise, 83 Iowa 596, 50 N.W. 59; State v. Reinheimer, 109 Iowa 624, 80 N.W. 669; State v. Saling, 177 Iowa 552, 159 N.W. 255, and State v. McKenzie, 204 Iowa 833, 216 N.W.29. The facts in each of those cases were so much more favorable to the respective defendants than are the facts in this case with respect to the defendant that they are of no ruling force. Opposed to the testimony of the State were the conclusion of his attorneys at the "bee" and the testimony of defendant's wife and two friends, who came to the jail about midnight, over two hours after the collision to see if they could help him out of his difficulties. The defendant was willing to submit to the "bee" test under those circumstances, but he refused the scientific tests when apprehended. It was the province of the jury to pass upon all factors bearing upon the probative worth of the evidence, and under the record we are not justified in disturbing its verdict.

II. Defendant assigned error because of the court's refusal to give his requested instruction on circumstantial evidence. The instruction began thus, "You are instructed that the State has offered no direct evidence of the alleged intoxication of the defendant * * *." This was a misstatement of the facts. The only evidence the State offered on that issue was direct evidence, and that was also true of the defendant. There was no reason for giving the requested instruction or any instruction on circumstantial evidence. The assigned error is without merit.

III. Defendant complains of an unfair trial because of misconduct by the sheriff and the county attorney. Error is assigned because the sheriff as a witness, a few times volunteered a remark after answering the question. Objection was made but once, and this is the instance: the sheriff had just answered that defendant had suffered because of the flooding of his home and place of business. He was then asked, by defendant's attorney,

this question: "And he was depressed about that? A. He should have been. I know his wife did not think much of his going out.

"Mr. W. P. Welch: I move to strike that as a voluntary answer and has no place in this lawsuit.

"The Court: It may go out.

"Mr. W. P. Welch: If Mr. Bullis is trying to influence this jury with these off-the-record matters——

"The Court: You are instructed to exclude any matters that I have excluded from the evidence."

In view of the court's admonition to the jury it cannot be held that there was any prejudicial error.

██ ██ IV. In his motion for a new trial, defendant alleged this ground: "9. Because of the fact that the principal witness for the State * * * namely, Cass Bullis, Sheriff of Harrison County, acting as bailiff in attendance upon said jury, and his misconduct in rapping on the door and asking them if they had arrived upon a verdict when no occasion arose for such misconduct on the part of said sheriff. That in no event should the principal witness, Cass Bullis, be permitted to act as said bailiff in attendance upon said jury during their deliberations."

The only matter in the record which tends to establish the facts alleged in the statement is the statement itself. No affidavit is attached to the motion. The defendant did not bring in the jury for examination. There is no proof of any of the matters stated in the record before us. If the sheriff did rap on the door to ask if the jury had agreed on a verdict it was within the authority given him under sections 337.7 and 780.37, Codes 1946, 1950, I.C.A.

If the matters stated in the motion were true we cannot presume that prejudice resulted to defendant. Prejudice must be shown. The ruling on the motion was within the court's discretion. State v. Davis, 230 Iowa 309, 312, 313, 297 N.W. 274; State v. Allen, 89 Iowa 49–53, 56 N.W. 261; State v. Siegel, 221 Iowa 429, 432, 264 N.W. 613.

██ V. Defendant assigned error because of claimed misconduct of County Attorney Murray in the cross-examination of the defendant's wife. The county attorney was having some difficulty in properly stating a question to her as a foundation for

her impeachment. The court sustained all objections to the questions. This is the record:

"The Court: Reframe your question, Mr. Murray. The question is improper in that form.

"Q. Well, I will start all over again. Isn't it a fact, Mrs. Franklin that in the second week of August of this year, during the last week immediately following the service of your original notice on Franklin in a divorce case against him——

"Mr. W. P. Welch: That is all objected to as highly improper, not cross-examination, and for the purpose of other than cross-examination it is improper in form, and I will ask the court to instruct the jury——

"The Court: You will disregard those remarks of Mr. Murray. It's not in evidence. It's the time and place and what she said is what I want.

"Mr. Murray: Well, I am going to have to go back to the clerk's office before I can get that date."

The county attorney then proceeded to frame his question to the satisfaction of the court and opposing counsel and it was answered without objection. The subsequent examination of the sheriff showed that the county attorney had a proper purpose in his interrogation of Mrs. Franklin.

The question was then asked: "State whether or not, Mrs. Franklin, you have ever been of the opinion that your husband is a habitual alcoholic?"

The question was improper and the court sustained objection to it. The county attorney did not persist in the examination.

The trial court was in the best position to know whether the conduct of the county attorney was prejudicial to defendant. It concluded that it was not. Objections were promptly sustained and the jury was admonished by the court to disregard the statements of the county attorney. We must assume that the jury noted the sustaining of defendant's objections and heeded the admonition of the court. State v. Caringello, 227 Iowa 305, 308–311, 288 N.W. 80; State v. Waterbury, 133 Iowa 135, 141, 110 N.W. 328; State v. Williams, 238 Iowa 838, 847-851, 28 N.W. 2d 514.

We have carefully studied the record and fully considered all errors presented by defendant. It is our conclusion that the defendant was fairly tried and that the judgment should be, and is,—Affirmed.

All JUSTICES concur except MANTZ, J., not sitting.