# BILLY BOB FARMER, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 10607

December 12, 1979                      603 P.2d 700

*Goodman, Oshins, Brown & Singer, Chtd.,* Las Vegas, for Appellant.

*Richard Bryan,* Attorney General, Carson City; *Robert Miller,* District Attorney, and *Melvin Harmon,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, MANOUKIAN, J.:

Billy Bob Farmer appeals from a conviction by jury for first degree murder, NRS 200.010 and 200.030, which resulted in the imposition of a sentence of life without the possibility of parole, contending that: (1) the jury verdict was coerced; (2) he was deprived of a fair trial by the use of a prosecution witness granted immunity; and (3) the prosecutor's remarks during closing argument constituted prejudicial error. Finding no reversible error, we affirm.

*1. The Facts.*

There was substantial evidence adduced at trial which showed that one Phillip Wroughton arranged to have appellant murder Ronald Craig Davis, apparently because Wroughton and appellant were suspicious that Davis had been informing the police about Wroughton's and appellant's criminal activities and because Davis was indebted to Wroughton. The state's evidence was presented through a series of witnesses who were either participants or precipitants in a variety of serious criminal offenses including drug trafficking, prostitution, receiving stolen property and, in at least one instance, possibly murder.

Wroughton owned a home in Las Vegas where Farmer and a number of prosecution witnesses lived prior to the instant homicide. Phillip Wroughton was murdered sometime subsequent to Davis' death, and appellant was also charged with that crime.

The record demonstrates that on October 20, 1976, Farmer and a James Logan went to Davis' home purportedly to discuss a cocaine transaction. Farmer and Davis were acquaintances. There was no sign of forcible entry which is an indication that Davis knew his assailants. Appellant was armed with a sawed-off shotgun wrapped in a towel. Earlier that day, a coat which

belonged to Farmer was seen in Farmer's residence and a similar jacket was discovered at the murder scene. The next day a state's witness who resided at the Wroughton residence observed Farmer cleaning a shotgun and at trial a police detective testified that he discerned an odor of gun cleaning fluid emanating from the seized gun. A firearms expert testified that the two shotgun blasts that killed Davis probably came from appellant's shotgun. The record is uncontradicted relative to threats made by Wroughton against Davis and admissions by Wroughton that appellant had committed the murder. Several of these threats and admissions make mention of appellant's complicity in the homicide and were made in his presence.

Farmer himself made extra-judicial admissions that he had murdered Davis. Pamela Cathey, a resident in Wroughton's home testified that Farmer had admitted shooting Davis. Phillip Carra also testified that appellant admitted in detail having killed Davis. Carra was a prospective co-defendant with Farmer, incidental to the Wroughton homicide, but was given immunity in exchange for his cooperation in that case.

After approximately five days of trial, the jury received its charge from District Judge Paul Goldman and commenced its deliberations at 11:45 a.m. on Friday, August 26, 1977. The jury continued to deliberate until 11:30 p.m. that evening, immediately after which it was sequestered. Deliberations resumed the following day at 8:15 a.m. Judge Goldman intended to leave Las Vegas on vacation on August 27 and had arranged for District Judge James Brennan to receive the verdict or to take whatever action was dictated by the circumstances.

Due to Judge Goldman's vacation plans, he was not available at the courthouse on Saturday, August 27. He had telephoned the courthouse on two occasions during the morning to inquire as to the jury's progress, and on the second occasion the bailiff asked Judge Goldman what action he should take should the jury indicate that they were not making progress. Judge Goldman instructed the bailiff simply to let the jury continue their deliberations. The bailiff was also instructed by Judge Goldman to contact Judge Brennan should any problem arise.

At approximately 12:00 noon, Judge Goldman called regarding the jury's progress and as a result of the bailiff's inquiry to the jury, it was determined that they were making progress. Then at approximately 1:00 p.m. on Saturday, August 27, the bailiff received a communication from the jury that stated: "Judge Goldman: We the jury feel we are no longer making progress in our deliberations. David A. Osbourne, jury foreman." Several minutes elapsed after which the bailiff opened

the door to the jury room and advised them, "The Judge said to continue deliberating." Judge Brennan was immediately notified of this action. There were no other communications with the jury until they returned their verdict at about 5:00 p.m. Saturday.

2. *The Verdict's Validity.*

Appellant, equating the bailiff's comment to the jury with an *Allen* charge, contends that in this context, such comment constituted coercion and thus invalidated the guilty verdict. He also alleges that, due to the bailiff's failure to comply with statutes which relate to jury deliberations, we must reverse. We do not agree.

An *Allen* or "dynamite" charge is an instruction to a deadlocked jury which contains an admonition that the case must at some time be decided or that minority jurors should reconsider their positions in light of the majority view. Allen v. United States, 164 U.S 492, 501 (1896); Redeford v. State, 93 Nev. 649, 652 n. 3, 572 P.2d 219, 220 n. 3 (1977).[1] We have held, in reluctantly approving the *Allen* charge, that in order for such an instruction to be valid, it must clearly inform the jurors that each member has a duty to adhere to his own honest opinion and the charge must avoid "creating the impression that there is anything improper, questionable, or contrary to good conscience for a juror to create a mistrial." Ransey v. State, 95 Nev. 364, 366, 594 P.2d 1157, 1158 (1979); *see also* Redeford v. State, 93 Nev. 649, 572 P.2d 219 (1977).

A simple request, as here, that the jury continue its deliberations is not inappropriate or coercive and does not amount to a "dynamite" charge. The instruction to the jury here did not suggest explicitly or implicitly that the jury was compelled to reach a verdict and did not render the verdict invalid. State v. Claridy, 563 P.2d 1239, 1241 (Or.App. 1977).

Not every communication elsewhere than in open court between jurors and court officials or attendants, after the case has been submitted to the jury for deliberation, is error. An inquiry of the jury by a custodian as to jury progress in reaching a verdict, without more, has generally been considered nonprejudicial. State v. Poffenbarger, 74 N.W.2d 585, 587 (Iowa 1956); State v. Franklin, 46 N.W.2d 710, 716 (Iowa 1951). We are in agreement with this authority.

[1]*See* Note, *The End of the Allen Charge in California: People v. Gainer,* 14 Cal. W.L. Rev. 453 (1978).

Appellant further argues that the bailiff's judicially authorized conduct constituted a *per se* violation of NRS 175.451, and was, *a fortiori,* reversible error. NRS 175.451 provides:

> After the jury have retired for deliberation, *if there is any disagreement between them as to any part of the testimony, or if they desire to be informed on any point of law* arising in the cause, they must require the officer to conduct them into court. Upon their being brought into court, the information required shall be given in the presence of, or after notice to, the district attorney and the defendant or his counsel.

(Emphasis added.) Here, however, the jurors were not requesting information regarding testimony or any point of law, and the statute relating to communications between the court and the jury has no application.

Appellant next asserts that the trial court did not comply with NRS 175.461. This statute provides that a jury shall not be discharged until they have arrived at a verdict unless "at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." NRS 175.461. Specifically, appellant contends that due to the judge's absence he was unable to determine that the jury could not agree. The evidence is to the contrary.

At the mistrial hearing, the bailiff testified that he conversed with Judge Goldman on the phone approximately one hour before the note was received from the jury. At that time, approximately 12 noon on Saturday, Judge Goldman told the bailiff to ask the jury if they were making progress. The foreman said that they were and Judge Goldman was so informed. The note stated the jury felt it was no longer making progress in its deliberations. The bailiff read the note, left, and after pausing for several minutes, told the jury, "The Judge said to continue deliberating." The jury returned its verdict at 5:00 p.m., with Judge Brennan presiding.

Although Judge Goldman had instructed the bailiff to tell the jury to continue deliberations, the trial judge was not uninformed of the progress of the jury. The bailiff, at the time of his second conversation with Judge Goldman, believed there would be no mistrial declared until at least 5:00 p.m. Judge Brennan, who was then supervising the proceedings, was aware of Judge Goldman's preferences but was left with the discretion to act consistent with or irrespective of them.

The length of time a jury should deliberate is within the sound discretion of the trial court. State v. Addington, 472 P.2d 225, 235 (Kan. 1970); NRS 175.461. The time should be determined by the facts and circumstances of the particular case and the reasonable probability that the jury can agree. State v. Crowley, 552 P.2d 971, 975 (Kan. 1976); NRS 175.461. *See also* People v. Carter, 442 P.2d 353 (Cal. 1968). The totality of the circumstances must be evaluated in determining the extent of the harm flowing from this type of communication. Factors to be considered are the nature of the communication and whether it was authorized or not; the length of the trial; the number of witnesses; the complicated nature of the proceedings; the duration of the jury's deliberations; the seriousness of the offense; the length of time the jury deliberated following the most recent communication with the court or bailiff; and such other factors relevant to the particular inquiry. Here, the trial consumed approximately five days, nineteen witnesses testified, the jury had deliberated approximately thirteen hours prior to the admonishment that they should continue deliberating, and the charge against the appellant was extremely serious. There is no showing that the jurors were in fact unable to agree upon a verdict and they deliberated for three additional hours before reaching the verdict. Although the bailiff's communication was not expressly authorized by statute, NRS 175.391,[2] it was not prejudicial. NRS 47.040(1); 178.598.

### 3. Prosecutorial Misconduct.

Appellant contends that he was deprived of a fair trial by improper prosecutorial closing argument. He claims that the deputy district attorney remarked that Farmer also killed Wroughton and that this error requires reversal. We disagree.

During his closing argument, and in recalling the testimony of several state's witnesses, the deputy district attorney stated:

> And Vicki Licausi, you remember Miss Licausi. Wroughton drove right straight to that car, that green Ford Ronnie Davis was using, and where were the keys? They were right in the ignition. He knew exactly where that car was. Do

---

[2]NRS 175.391 provides in part:

Upon commencing deliberation, the jurors shall be kept in charge of a proper officer, unless at the discretion of the court they are permitted to depart for home overnight. When the jurors are kept together, the officer in charge shall keep the jurors in some private and convenient place and separate from other persons. *He shall not permit any communication to be made to them, or make any himself, unless by order of the court, except to ask them if they have agreed upon their verdict. . . .* (Emphasis added.)

*you know who told him?* **The man who murdered him told him where that car was.** *He knew where to get that car.*

(Emphasis added.) The statement is, at the most, innocuous when considered with the totality of the evidence and other argument. Appellant contends that the emphasized portion actually meant, "The man who murdered [Wroughton] told [Wroughton] where that car was." Respondent contends that it may have meant, "The man who murdered [Ronnie Davis] told [Wroughton] where that car was." There had been no evidence presented that appellant had killed Wroughton.

The record reflects that the prosecution was referring to several different people at the same time and using many pronouns. Respondent's interpretation is cogent and reasonable when considered in light of the testimony and the surrounding closing argument. The testimony of Vicki Licausi was that she had been told by Wroughton that she could use the green Ford. Investigating officer Barlow testified on cross-examination that the car was registered to Wroughton and that he was at the death scene "to retrieve the vehicle." Melanie Jones, a prosecution witness, who had been at the victim's residence frequently, testified that Davis had used the Ford up to his death and she did not recall that he had ever left the keys in the car.

Viewing this referenced testimony in context with the remainder of the prosecutor's closing remarks, it is clear that the prosecution is inferring that Farmer left the keys in Wroughton's car after killing Davis. Farmer then related the information to Wroughton, his alleged accomplice, who used Vicki Licausi to retrieve Wroughton's car when police were still at the death scene. Thus, "[Wroughton] knew exactly where that car was. Do you know who told him? The man who murdered [Ron Davis] told [Wroughton] where the car was. [Wroughton] knew where to get that car."

Additionally, the prosecution had not at any time during the course of the trial mentioned another *murder by appellant.*[3] There was no previous mention of another murder in closing argument. The jury should have been aware only of the one

[3]The fact that Wroughton was deceased had been mentioned previously during the trial. A police officer testified that he knew that Wroughton was now deceased and Billy Mills testified that he discovered that a possible accomplice in the Davis murder was in Arizona at the time Wroughton was killed. After the officer was asked if he knew Wroughton was deceased, it was defense counsel who requested an admonition to the jury that it not attribute his death to the appellant or anyone else connected with the case. There had not been any inference made that his death was so attributable. The testimony by Mills was in response to a prosecution question as to when Mills had heard that a certain person was in Arizona. Defense counsel's immediate request for a mistrial and

homicide—the Ron Davis murder. We can assume that the jury, under the instructions requested by the defense during the trial, properly ignored any suggested inference that Wroughton's death was attributable to Farmer.

If remarks are such as to cause doubt as to whether the defendant was prejudiced, the doubt should be resolved in favor of the defendant. Spomer v. State, 395 P.2d 657, 664 (Okla.Crim.App. 1964) (prejudicial remarks by trial judge regarding another case pending against accused required reversal). Moreover, improper argument is presumed to be injurious especially when the remarks call to the jurors attention matters they are not justified in considering. Riley v. State, 91 Nev. 196, 198, 533 P.2d 456, 457, cert. denied, 423 U.S. 868 (1975). Here, however, respondent could properly argue, and the jury was entitled to draw inferences from the acts of appellant, that appellant had informed Wroughton, after Davis' death, as to the location of and circumstances surrounding the vehicle.

Furthermore, where the case, as here, is not close on guilt or innocence, prosecutorial remarks will not justify reversal. Dearman v. State, 93 Nev. 364, 369, 566 P.2d 407, 410 (1977). Even if the remark is considered improper, because of the overwhelming evidence of guilt, we would view the error as harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24 (1967); Hendee v. State, 92 Nev. 669, 670, 557 P.2d 275, 276 (1976).

4. *Witness Immunity.*

Lastly, appellant specifies as error the alleged deprivation of a fair trial by the use of a prosecution witness granted immunity. He contends that Phillip Carra should not have been permitted to testify in the instant case because of the state's grant of immunity to Carra in connection with the murder of Phillip Wroughton.[4] But for the grant of immunity, appellant and

the utterance of a profanity in front of the jury would have drawn more of an inference that Wroughton's death was attributable to appellant. We cannot say that the fact that the death of a figure mentioned in a murder trial is brought out is, by itself, ground for a mistrial or constitutes error.

[4]It is apparent to this court that when Carra took the witness stand the defense was fully apprised of the grant of immunity and could well anticipate that Carra's testimony would be instrumental to the prosecution's case. Yet, no objection was interposed. Although we have often held that absent a timely objection this court will not consider an issue raised for the first time on appeal, Thomas v. State, 93 Nev. 565, 566, 571 P.2d 113, 114 (1977); Allen v. State, 91 Nev. 78, 81–82, 530 P.2d 1195, 1197 (1975), due to the arguable merit of the due process claim and as a result of our intervening opinion in Franklin v. State, 94 Nev. 220, 577 P.2d 860 (1978), we have decided to consider the merit of the contention.

Carra would have been joined as co-defendants in the Wroughton case. In proffering his due process contention, appellant relies solely upon Franklin v. State, 94 Nev. 220, 577 P.2d 860 (1978). In that case the court stated:

> By bargaining for specific testimony to implicate a defendant, and withholding the benefits of the bargain until after the witness has performed, the prosecution becomes committed to a theory quite possibly inconsistent with the truth and the search for truth. We deem this contrary to public policy, to due process, and to any sense of justice.

94 Nev. at 225, 577 P.2d at 863 (footnote omitted).

Appellant's reliance is misplaced. First, in *Franklin,* unlike in the present case, an accomplice of the defendant, who had actually executed the contract to kill, testified for the prosecution. He was liable to prosecution for the murder for which the defendant, Franklin, had been convicted. *Cf.* People v. Medina, 116 Cal.Rptr. 133 (Cal.App. 1974) (immunity granted on condition that witness not materially change statement given to police); People v. Green, 228 P.2d 867 (Cal.App. 1951) (accomplice granted conditional immunity to testify in case in which he was charged). In contrast, Carra was never implicated in any way in the Davis slaying. Carra and Farmer allegedly killed Wroughton and it was for this crime that Carra was granted immunity. In fact, the evidence is clear that neither the state nor Carra anticipated Carra would testify in the instant case until the eve of the trial.

Second, in *Franklin,* the accomplice's sentencing was deferred pending the rendition of his trial testimony, leaving the inference that his immunity was conditioned upon the giving of testimony consistent with his pre-trial statement. *See* People v. Medina, 116 Cal.Rptr. 133, 144–51 (Cal.App. 1974). Carra's immunity was unqualified and was given long before the date of his appearance as a witness in the instant case. The state was not in a position to compel Carra to testify in a manner which would support the state's theory of the case.

Finally, in *Franklin,* a substantial part of the direct evidence regarding the murder conspiracy and actual homicide was supplied by the actual perpetrator and, without it, the evidence may have supported an innocent verdict. In the instant case, although we are unable to say that his testimonial contribution was not sufficient to be determinative of the issue of guilt, the evidence of guilt, independent of Carra's testimony, is substantial and, in our view, sufficient to support the conviction.

In People v. Green, 228 P.2d 867 (Cal.App. 1951), the court stated, "It is a practice which seems to be approved in all jurisdictions, if the ends of justice will be thereby served, to extend

immunity to *one jointly charged with crime,* upon condition that he testify fully and fairly as to his knowledge of the facts out of which the charge arose.'' *Id.* at 871 (emphasis added). We have recognized that grants of immunity in exchange for testimony are generally permissible and the promise of leniency affects only the weight of the evidence, not its admissibility. LaPena v. State, 92 Nev. 1, 6, 544 P.2d 1187, 1190 (1976); *see also* Farmer v. Sheriff, 93 Nev. 535, 569 P.2d 939 (1977). Here, the promise of immunity was unqualified and related to another transaction. In addition, there is nothing in the record to indicate that the grant of immunity was conditioned on anything other than Carra's testifying fully and fairly as to his knowledge of the facts out of which the Wroughton murder charge arose. This record is devoid of any suggestion that that promise of immunity is repugnant to the letter or spirit of Nevada's criminal jurisprudence. *See* People v. Green, 228 P.2d 867, 870 (Cal.App. 1951). This contention is without merit.

MOWBRAY, C. J., and THOMPSON, J., concur.

BATJER and GUNDERSON, JJ., concur in the result.