Young, J.,
with whom Rose, C. J., joins,
dissenting:
The Honorable Justice Hugo Black once wrote:
Juries fairly chosen from different walks of life bring into the jury box a variety of different experiences, feelings, intuitions, and habits. Such juries may reach completely different conclusions than would be reached by specialists in any single field .... On many occasions, fully known to the Founders of this country, jurors — plain people — have manfully stood up in defense of liberties against the importunities of judges and despite prevailing hysteria and prejudices.
Toth v. Quarles, 350 U.S. 11, 18-19 (1955).
Because the trial judge’s coercive in-chamber “conversation” with a lone holdout juror frustrated that juror’s forthright effort to stand in “defense of liberty” and thereby deprived appellant of his right to a fair trial by an impartial, uncoerced jury, I respectfully dissent. In addition I cannot join the majority in affirming appellant’s conviction based on a harmless error analysis because I strongly believe that an application of harmless error is wholly misplaced in this context and in no way ameliorates the grievous harm from which appellant suffered.

The Coercive “Conversation”

The Sixth Amendment of the United States Constitution guarantees, among other things, that in criminal prosecutions the accused shall enjoy the right to an impartial jury. As a corollary, *932 “[a]ny criminal defendant. . . being tried by a jury is entitled to an uncoerced verdict of that body.” Lowenfield v. Phelps, 484 U.S. 231, 241 (1988). As this court stated many years ago in State v. Clark, 38 Nev. 304, 310, 149 P. 185, 187 (1915): “It is a right guaranteed to a defendant on trial for a criminal offense that he shall have the judgment of twelve [people] uninfluenced by matters foreign to the evidence admitted at the trial.” This admonition would seem to preclude judicial interference from jury deliberations. Generally this court’s approach to allegations of judicial overreaching and coercion requires that we examine the claimed error in the context of all the facts and circumstances surrounding the case. White v. State, 95 Nev. 881, 885, 603 P.2d 1063, 1065 (1979).
I believe that a review of the facts and circumstances surrounding the jury deliberations and verdict in the instant action summon but one conclusion: the trial judge’s in-chamber face to face encounter with the holdout juror unduly pressured that juror to change his view of the case and vote on the verdict.
Appellant’s grand larceny trial consumed approximately a day and one-half on June 24-25, 1991. The court submitted the case to the jury at 11:03 a.m. on June 25. Later that afternoon the judge received a note from the jury stating that they could not render a unanimous decision. The court conducted a jury poll, and although the judge did not know whether the vote leaned towards acquittal or conviction, the court learned that the vote stood at 9 to 3. At 4:00 p.m., the judge brought the jury into the courtroom and gave an Allen or “dynamite” charge. At 5:00 p.m., the judge dismissed the jury until the following day at 8:00 a.m. At 12:10 p.m., June 26, the judge called counsel to chambers and informed them that he had received two notes from the jury. The first note stated that the jury had incurably deadlocked, while the second note related that the deadlock resulted from one juror’s refusal to consider circumstantial evidence. The judge called the jury forewoman into his chamber. The jury forewoman informed the judge that the holdout juror stated that he could not see a videotape played during the trial and that the juror admitted that he would not consider circumstantial evidence. The judge brought the dissenting juror into his chamber and the following ensued:
The Court [to the juror]: Are you able to hear well?
Juror: Yes.
The Court: Did you hear the trial, everything that went on in the trial?
Juror: I tried to listen to everything. Yes.
The Court: I don’t mean that. I said, did you hear everything that went on in the trial?
*933 Juror: Yes, yes. I heard everything.
The Court: Do you remember when I told you that you were to raise your hand in the event you could not hear anybody?
Juror: That’s right.
The Court: And were you able to hear everybody throughout the trial?
Juror: That’s right, that’s right. Yeah you have your microphone set up pretty well.
The Court: Now were you able to see the tape as it was played on the television?
Juror: From the jury box?
The Court: That’s correct.
Juror: Yes.
The Court: You were?
Juror: Yes, sir.
The Court: Alright. I have been told by your foreman that you refuse to follow the Court’s instructions and that you will not consider circumstantial evidence. Is that correct?
Juror: I didn’t say that.
The Court: What did you say?
Juror: I didn’t say that. I said, I don’t believe the complaining witness, the woman that’s finding the complaint. I don’t believe her story too well. Also, she had . . .
The Court: Well, let me ask you — I’m not interested in specifics. Are you considering the circumstantial evidence?
Juror: I certainly am, sir.
The Court: Alright. Then I’m going to instruct you to get back in there and continue deliberating.
Juror: Alright.
Jury Forewoman: Can I say something?
The Court: Yes.
Jury Forewoman [to the juror]: You told us the only way you would believe this gentleman stole the purse, was if you — If he admitted to it, or if you actually saw him pick up the purse. To me, that is not considering the circumstantial evidence.
Juror: Well, there’s a couple of ways. There’s several other ways. There might be other ways too.
Jury Forewoman: We have to use common sense here.
Juror: There might be other ways too, you know.
Jury Forewoman: Right.
The Court: Are you telling me you’re willing to go back in there and consider circumstantial evidence?
Juror: Yes. Why not?
*934 The Court: Then go back in there and do that.
Juror: Alright.
The Court: Go ahead.
Juror: Now, might I add a question here—
The Court: Not at this point.
Juror: —or statement?
The Court: Any questions come to me through your foreman.
Juror: Not a question, but a point of what’s going on in there.
The Court: No.
Juror: Oh, okay.
The holdout juror and the forewoman then returned to the jury room and the jury continued deliberating. At 3:35 p.m., upon its request, the jury reheard the victim’s testimony. At 4:30 p.m., the jury returned a guilty verdict.
Reviewing the transcript and listening to an audio tape recording of this “conversation” persuades me that the court acted unnecessarily condescending and curt with the dissenting juror. Indeed, after the juror affirmatively answered that he could see the videotape, the judge sternly questioned him again. In addition, when the juror stated that he did not believe the victim’s allegations, the judge forebodingly ordered him to return to the jury room and continue deliberating. While strongly suggesting to the juror to consider circumstantial evidence and resume deliberations, the court neglected to remind the juror of his duty to render an honest opinion and maintain his consciously held beliefs.
Thus, I am concerned that the juror walked away from the in-chamber grilling with a one-sided message: “Your deliberative processes are improper. Go back into the jury room, look at the circumstantial evidence and find the appellant guilty.” Moreover, the judge, effusing a quiet comme ilfaut, allowed the forewoman to freely deride the holdout juror, commanding the juror to apply common sense. Conversely, when the holdout juror attempted to explain the happening in the jury room, the judge abruptly and immediately cut him off, again commanding the juror to rejoin the jury.
Although brusqueness alone may not signify improper judicial coercion, the judge’s austere manner coupled with calling the juror to the carpet in the portentous and official milieu of a judge’s chamber would undoubtedly strike fear in the hearts of most seasoned litigators, let alone lay jurors. In addition, even though it is unclear from reading the transcript, listening to the audio tape recording of the contested conversation convinces me *935 that the tone, tenor and environs of the in-chamber discussion were unjustifiably coercive.
While one can glean the nature of the interaction between the judge and juror from the audio tape and the transcript, the compelling impact of the discussion is also strikingly apparent by comparing the amount of time it took the jury to return a verdict after the “conversation” with the time that the trial and the pre-conversation jury deliberation consumed. The trial began at 1:55 p.m. on June 24, 1991. The State’s eight witnesses testified in approximately two hours,[1] and it appears that the proceedings ended on June 24 before 4:30 p.m. The trial reconvened the next morning at 10:20 a.m. After closing arguments the court submitted the case to the jury at 11:03 a.m. Thus the presentation of the evidence consumed about two and one-half hours with the total trial time lasting approximately three hours. Contrast this with the substantial amount of time the jury deliberated prior to the “conversation” — approximately nine and one-half hours (allowing also for a one-hour lunch period on both days) from June 25 at 11:03 a.m. until 12:10 p.m. on June 26. Then, after the coercive conversation on June 26, the jury returned its verdict in approximately three hours. A reasonable explanation as to why the jury relatively quickly returned a verdict after the encounter between the judge and juror is that the judge’s words and demeanor unduly influenced the holdout juror to abandon his consciously held beliefs.
In Farmer v. State, 95 Nev. 849, 853, 603 P.2d 700, 703 (1979), we mused in passing that “[n]ot every communication elsewhere than in open court between jurors and court officials or attendants, after the case has been submitted to the jury for deliberations, is error.” However, the facts of Farmer stand in such sharp contrast with those at bar that the Farmer dicta has little persuasive application to the matter at hand. The court bailiff, in Farmer, upon learning that the jury failed to progress in its deliberations, opened the door to the jury room and advised the jury to re-start deliberations. Id. at 852-53, 603 P.2d at 703. In Farmer we decided that the bailiff’s conduct did not invalidate the verdict because it amounted to a “simple” non-coercive request that the jury recommence its deliberations. Id. By contrast, in the instant matter, the court’s involvement in the jury’s deliberative process was far more intrusive — the judge singled-out the one minority juror and ordered that juror into his chamber. Moreover, as the transcript clearly reveals, the “conversation” between the judge and dissenting juror constituted *936 much more than a “simple” request to continue deliberating as in Farmer.
Even though an analogy to Farmer is questionable, a case of the same vintage, Ransey v. State, 95 Nev. 364, 594 P.2d 1157 (1979), suggests a useful comparison. In Ransey, we found that the trial judge committed prejudicial error in calling the entire jury into the courtroom and giving a charge which in essence told the lone dissenting juror that he should be open-minded and not obstinate. Id. at 367, 594 P.2d at 1157-58. Thus, we reversed Ransey’s conviction and remanded his case for a new trial. Ransey implies that it is improper for a judge to single-out a minority juror without reminding those individual holdout jurors not to surrender consciously held opinions for the sake of judicial economy. I think that the facts of appellant’s case are far more offensive than those of Ransey and, thus, warrant the same conclusion we reached in Ransey.
Finally, while examining the circumstances of this case, there came to mind similar scenarios involving improper Allen or “dynamite” charges. “An Allen or ‘dynamite’ charge is an instruction to a deadlocked jury which contains an admonition that the case must be at some time be decided or that minority jurors should consider their positions in light of the majority view.” Farmer, 95 Nev. at 853, 603 P.2d at 703. In reluctantly approving Allen charges, this court has held that such charges are only valid if they inform jurors that each member has a responsibility to adhere to his or her own honest opinion. The “dynamite” charge must also avoid “creating the impression that there is anything improper, questionable, or contrary to good conscience for a juror to create a mistrial.” Ransey, 95 Nev. at 366, 594 P.2d at 1158. Thus, it follows that an Allen charge is bad “if the holdout juror(s) could interpret the charges as directed specifically at them — that is, if the judge knew which jurors were holdouts and each holdout juror knew that the judge knew he was a holdout.” United States v. Ajiboye, 961 F.2d 892, 894 (9th Cir. 1992).
In this case, the “conversation” that the district judge had with the holdout juror does not fit neatly into the traditional definition of an Allen charge; the judge neither instructed the juror that the case had to be decided sometime nor specifically ordered the juror to reconsider his position in light of the majority view. Nonetheless, in tone, tenor and elocution the judge’s message to the steadfast juror is tantamount to similar demands made under the guise of a “dynamite” charge. And, as is the case with an unseemly Allen charge, the juror knew that the judge’s message was directed solely at him. Moreover, similar to a troublesome Allen instruction, I think implicit in the juror’s encounter with the *937 judge writhed the suggestion that the juror should not trust his own opinion in deliberating.
In sum, an overly coercive hue colored the circumstances surrounding the trial judge’s interrogation of the lone dissenting juror as to whether, in essence, the juror was deaf, dumb or blind, and thus, I would reverse appellant’s conviction.

Harmless Error

Preliminarily, after examining the entire record on appeal, I harbor no doubt as to appellant’s guilt. The videotape played at trial shows appellant in possession of the victim’s purse shortly before the victim reported the crime. That, however, is not the point. My and my colleagues’ views of appellant’s guilt are utterly inconsequential — the jury is the only body whose conclusions matter; and if trial error sullied that body’s view, then appellant is entitled to a new trial. Indeed, regardless of “overwhelming” evidence of appellant’s culpability, appellant deserved a fair trial by an uncoerced jury, something denied him by the judge’s impermissible conduct.
In turn, I am genuinely troubled by any attempt to rationalize appellant’s conviction, notwithstanding the coerced verdict, based on a notion that the evidence in the record, namely, the videotape showing appellant in possession of the victim’s purse, was overwhelming. I am deeply disturbed by the effort in the face of the seemingly overwhelming evidence of appellant’s guilt to neutralize the inexcusable violation of appellant’s right to a fair trial as harmless error.
For too long we have administered a harmless error analysis as a panacea for nearly all ills that infect criminal trials. It is perhaps time that we re-examine this course of treatment in light of recent United States Supreme Court proscriptions.
In June 1993, the United States Supreme Court announced Sullivan v. Louisiana, _U.S. _, 113 S.Ct. 2078 (1993). In Sullivan the high court concluded that a defective reasonable doubt instruction is not amenable as harmless error. In reaching this conclusion, the Sullivan Court elucidated the proper approach an appellate court should follow in applying a harmless error analysis. Specifically, the Court affirmed the “structural” error v. “trial” error harmless error test adopted by the Court in Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246 (1991).[2] *938 The Court also outlined an additional harmless error test culled from the landmark decision in Chapman v. California, 386 U.S. 18 (1967), reh’g denied, 386 U.S. 987 (1967).[3]
In explaining the new Sullivan harmless error test, the Court stated:
The question [Chapman] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. Harmless-error review looks, we have said, to the basis on which “the jury actually rested its verdict.” The inquiry in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered — no matter how inescapable the findings to support the verdict might be — would violate the jury-trial guarantee. ... [If there is] no jury verdict within the meaning of the Sixth Amendment, the entire Chapman review is simply absent. There being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the same verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless. There is no object, so to speak, upon which harmless-error scrutiny can operate. The most an appellate court can conclude is that a jury would surely have found petitioner guilty beyond a reasonable doubt not that the jury’s actual finding of guilty beyond a reasonable doubt would surely have not been different absent the constitutional error. That is not enough. The Sixth Amendment requires more than appellate speculation about a hypothetical jury’s action, or else directed verdicts for the State would be sustainable on appeal; it requires an actual jury finding of guilty.
*939 Sullivan, 113 S.Ct. at 2081-82 (citations and footnotes omitted).
After reviewing the circumstances of this case, I conclude that the error in this case is not amenable to harmless error analysis under either the new Sullivan standard or the Fulminante “structural” v. “trial” error harmless error inquiry.
Analyzed under Sullivan, I believe that the jury in this case did not render a verdict within the meaning of the Sixth Amendment, and thus, without a verdict the premise of the Chapman review is missing. The jury in appellant’s case consisted of eleven people who thought appellant was guilty beyond a reasonable doubt and one holdout juror who expressed reservations about appellant’s guilt beyond a reasonable doubt by commenting that he did not believe the victim’s story. The coercive conversation with the judge then pressured the holdout juror into returning a guilty verdict. Given these facts, appellant did not receive a valid and fair guilty verdict as required by the Sixth Amendment, and thus, this case does not have a verdict upon which to base a Chapman harmless error review.
Additionally, as Sullivan directs, this court must review what effect the assailable error had, not upon a reasonable jury, but upon the jury in the case at hand. A “reasonable” jury may have convicted appellant, with or without the judge’s coercive comments to the juror. However, looking only at the jury in this case, with the coercion the jury returned a guilty verdict, while absent the coercion, undoubtedly this jury would have hung, 11 to 1. This conclusion seems manifest given the short amount of time the jury deliberated after the coercive conversation relative to the nine and one-half hours of deliberation prior to the judicial intrusion. Thus, I do not think we can conclude that the verdict in this trial was “surely unattributable” to the coercion.
Examined under the Fulminante test, I suggest that the coerced jury verdict in this case constitutes a “structural” error or a “trial mechanism” defect rather than a “trial” error that occurred during the presentation of the case to the jury.
The right to a fair jury trial transcends the criminal processes; it embodies a fundamental thread in our patchwork quilt of justice. It is the manifestation of that inviolable right to have a jury of one’s peers — “plain people” rather than a law school-disciplined judge — reach a verdict. Jury coercion signifies more than a simple trial error or a mistake in the trial workings — the presentation of evidence or the examination or witnesses.
It is a disheartening sign of a system that elevates the end result over sacrosanct process and eviscerates the need for a jury in favor of the judiciary’s “learned” perspective of evidence. A coerced jury verdict quakes the trial structure, rocking the trial mechanism off its hearty foundation with the same fury and force *940 as would a trial presided over by a biased judge, or a trial where the court denies defendant counsel or self-representation. And in a case such as this, when the aftershocks subside and the dust clears, no amount of “overwhelming” evidence of the defendant’s guilt can render the verdict habitable.
In conclusion, in reviewing this case, I am painfully reminded of the Ninth Circuit’s recent pronouncements in Standen v. Whitley, 994 F.2d 1417 (1993), where the federal court strongly chided us for rationalizing Standen’s conviction based on a finding that substantial evidence supported the verdict. Id. at 1423. At his trial, Standen’s original guilty plea, which he had lawfully withdrawn, was introduced by the prosecution. The trial judge improperly instructed the jury that it could consider the plea as evidence against Standen. On appeal to this court, we affirmed Standen’s conviction, notwithstanding the error. Thereafter, the Ninth Circuit issued a writ of habeas corpus, finding that we had no basis under the law for reviewing this constitutional harm under a substantial evidence analysis. The Standen court went on to hold that the error in admitting the guilty plea could not be neutralized under a harmless error analysis, but instead the court noted that the error “effectively destroyed the trial itself, undermining its structure to the extent that the trial itself became an empty shell.” Id. at 1422.
As I reflect on striking similarities between the instant matter and Standen, the “parting shot” of Ninth Circuit Judge Nelson’s concurrence reverberates in my thoughts:
[The] failures in Standen’s case were basic and repeated. However, when the Nevada Supreme Court had the chance to correct the error in 1985, it applied the wrong test. There was substantial evidence to support the verdict. Unfortunately, this was not the question which was posed by Stan-den, but it was the one which that Court answered. No one’s interests, whether the public’s or Standen’s, have been served in this case. We can hope we have all learned from it.
Id. at 1426.
Unfortunately, with respect to this case, I cannot help but think that we have perhaps failed to learn from our prior mistake, and thus, I dissent.

Appellant chose not to present any witnesses in his defense.

In Fulminante the Court held that “structural” defects are those in the constitution of the trial mechanism, and thus, they defy analysis by harmless error standards. Fulminante, 111 S.Ct. at 1265. The Fulminante Court further explained: “Each of these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the process itself.” Id. Conversely, “trial” *938 errors, as defined in Fulminante, are those which occur “during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.” Id. at 1264. For a non-exhaustive list of errors that the Supreme Court has characterized as amenable to harmless error analysis, see Fulminante at page 1263.

In Chapman, the Court rejected the position that all constitutional errors in criminal trials automatically require reversal. The standard created in Chapman acknowledges that “certain constitutional errors, no less than other errors, may have been ‘harmless’ in terms of their effect on the fact finding process at trial.” Chapman, 386 U.S. at 22.