Warren Robert STANDEN,
Petitioner–Appellant,

v.

Harol WHITLEY, et al., Respondents–
Appellees.

No. 91–16422.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 8, 1993.

Decided June 4, 1993.

summary judgment.

John C. Lambrose, Asst. Federal Public Defender, Las Vegas, NV, for petitioner-appellant.

Kevin G. Higgins, Asst. Atty. Gen., Carson City, NV, for respondents-appellees.

Before: GOODWIN, NOONAN and T.G. NELSON, Circuit Judges.

NOONAN, Circuit Judge:

Convicted of murder in the first degree and sentenced to life imprisonment without the possibility of parole, Warren Robert Standen seeks a writ of habeas corpus. At his trial his original plea of guilty, which he had lawfully withdrawn, was introduced by the prosecution, and the jury was instructed by the court that the plea could be considered as evidence against Standen. We hold that this instruction deprived Standen of due process of law and had a substantial and injurious effect in determining the verdict of the jury. We therefore order that the writ issue.

## FACTS

The evidence presented by the prosecution showed the following:

Kaylyn Danner lived in Reno, Nevada in a trailer with her three children, ages 14, 11 and 10. She had been separated from her husband for four months. On the evening of January 31, 1978 her husband came to see her at the trailer. He left about 10:00 p.m.

Kaylyn Danner visited her friend Jeannie Sweet at approximately 11:00 p.m. She was due to begin the night shift at midnight at the Monte Carlo Casino on Sixth Street, Reno, about a seven minute drive from Sweet's residence. She left Jeannie Sweet for the casino at approximately 11:40 p.m. No witness saw her alive again.

Kaylyn Danner's body was found the next day, February 1. It lay on a turnoff from a dirt road in Sparks, Nevada, 5.7 miles east of the Monte Carlo Casino. The area at this date was not built up. The area was unlighted at night.

Kaylyn Danner had been stabbed in the back with a knife fifteen times; stabbed six times in the chest; deeply scratched on the face; and cut on her hands. Her throat had been slit. The hour of death could not be ascertained.

The body was partly clothed. Semen, not older than 48 hours, was in her vagina, but the medical examiner did not detect trauma to her genitals and was unable to say that she had been raped. Her lifeless fingers clutched her office key. Near the body were her boots, papers apparently dumped from her purse, and the broken cover of the domelight of a car, later determined to be hers. A .22 caliber handgun she carried in the glove compartment, her credit card, and a little cash disappeared and were never found.

On the night of the murder a householder at a distance observed the tail lights of two cars pull into the turnoff on January 31—one at about 6:00 p.m., one at about 10:30 p.m. The tail lights went out. He saw no more.

Two to three miles from where the body was found was Sierra Sid's 76 Truck Stop. The yellow Camaro Kaylyn Danner had been driving was found in the zone reserved for trucks at Sierra Sid's. The car's domelight had been broken. Blood had splattered the interior, a windowscraper, one window, and

the hood. Kaylyn Danner's purse, pants, pantyhose, and panties were in the back seat.

Three days later, on February 4, a search with Explorer Scouts, high school students used as police auxiliaries, found a trucker's logbook 5 to 7 feet off a dirt road. The logbook was discovered either 998 feet or 3500 feet from where the body had been found (different distances being supplied by the same witness). The book, a green notebook with snaps, contained the name of an employer, City of Fun Carnivals, and of a trucker working for City of Fun, Warren Standen. The entries in the logbook ended in November 1977, except for the telephone number of the Eldorado Motel, Reno and the name "Larry, Larry, Larry." The book had only three, indecipherable fingerprints.

Standen was an itinerant carnival worker, originally from Rome, New York. He had an IQ of 65. He had worked for City of Fun Carnivals as a laborer, ride operator, and driver in October–November, 1977; his logbook reflected his trips for this enterprise. On January 24, 1978 he flew from Chicago to Reno and checked into the Holiday Inn on Sixth Street. He checked out at 1:32 p.m., January 31, 1978.

The Holiday Inn is adjacent to the Monte Carlo Casino. The manager on duty the evening of the 31st was familiar with Standen because he had sought refunds on American Express travellers' checks. She noticed him, apparently waiting for someone, in the lobby of the Holiday Inn between 11:20 p.m. and 11:40 p.m. He was wearing an overcoat or raincoat and was carrying an object that may have been his logbook.

Standen was next observed at Sierra Sid's in Sparks. The time was approximately 12:20 a.m., February 1. He used a telephone at Sierra Sid's to call a cab. He looked well-groomed, not like a man who just had been in a fight. According to Betty Johnson, the casino manager at Sierra Sid's, "He was clean and attractive-looking, like he was going out on a date or something." The cabdriver, Kevin Ryan, entered Sierra Sid's to pick him up. Standen got into the cab and sat in the front seat, making no effort to avoid being seen. He looked neat and composed. Ryan recognized him as a passenger he had had before and whom he had telephoned at the Holiday Inn in an effort by Ryan to arrange a 24-mile roundtrip to the Mustang Ranch, a legal brothel. According to Ryan's first statement to the police, Standen was not wearing a coat nor carrying any objects; at trial he remembered nothing about Standen's clothes until his first statement was read back to him.

Three minutes into the ride Standen asked Ryan to return to the truck stop. According to Ryan's first statement to the police, Standen said he had forgotten that he was supposed to meet someone at the truck stop. According to Ryan's trial testimony, Standen said he had forgotten something. Standen re-entered Sierra Sid's and asked if anyone had seen a logbook, then went to look for it in the restaurant. He did not ask the cab to wait. His subsequent movements that night are not known, but eventually on February 1 he checked into another Reno motel, the B–J.

A warrant was issued for Standen's arrest for murder. On July 19, 1978 he was apprehended in a jail in Monroe County, New York, under the alias of Larry Mattson. In the course of the journey back to Nevada for trial, Standen told the deputies that he had not committed the crime; that they had only his logbook ("now I know where it went to"); that he would make an ass out of the district attorney; that he knew who had committed the murder and would not be a snitch yet he would reveal the name after his own conviction; and that if they found the man who used Larry Mattson's credit card, they would "find the guy you're looking for." Standen had the credit card on his person along with other papers identifying him as Larry Mattson.

Larry Mattson was a businessman from Klamath, Oregon who had been in Reno on January 31, 1978. He testified that his wallet, his credit card, driver's license, and pilot's license "came up missing" on this date. He believed the loss must have occurred after noon on the 31st as he had used the card to check into the Eldorado Motel. He checked out on February 1st, apparently not using the card again. He reported the credit

card loss to the credit card company on February 7th and to the police on February 13.

The credit card had been used since its disappearance. On February 1 it was used to check two men (one later determined to be Standen) into the B–J Motel. On February 4 it was used to buy two bus tickets from Reno to Las Vegas. It was then used in Las Vegas to check two men into the Hotel Nevada; Standen was one of them. The next day the card was used to rent a car. The signature of Larry Mattson was forged on all these credit slips by a hand that could not be identified.

The trail of forged slips led to Bellingham, Washington, where Standen made a half-hearted attempt to sell the rented car. Thereafter the card was used and the Mattson signature forged by Standen. On February 17, 1979 the car was abandoned in Florida. When Standen was apprehended in New York he still had the Mattson card and papers.

The semen found in Kaylyn Danner's vagina indicated the donor was a Type A secretor. Standen has Type A blood as does 32 percent of the male population of the United States. Pubic hairs found in Danner's undergarments were consistent with specimens provided by Standen. Hairs found in the back seat of the Camaro were consistent with hairs from his head.

## PROCEEDINGS

On September 24, 1978 a complaint charging "open murder" was read to Standen. An open murder charge does not apprise the accused of the elements of the crime nor that it is murder in the first degree. An information charging the same offense was read to him on November 2, 1978, and he pleaded not guilty. In January 1979 the state filed notice of its intention to seek the death penalty. Negotiations for a plea ensued. On February 13, 1979 Standen changed his plea to guilty. He was sentenced to life without the possibility of parole.

At his own request Standen was then interviewed at the Nevada State Prison and gave some account of his activities near the time of the murder. He denied being at Sierra Sid's the early morning of February 1, 1978. He said that when he left the Holiday Inn on January 31 he put his belongings in the car of a man named Paul Santmeyer and moved to the B–J Motel across from the bus depot in Reno where he shared lodgings with Santmeyer, Larry Mattson, and perhaps one other. He said he stayed there two weeks with Larry Mattson although Santmeyer left shortly after the move. When the deputies pointed out that the motel records showed he had only stayed at the motel one or two nights, he then said that they had stayed in Santmeyer's car. He said that the person responsible for the murder was "Ron." He said Ron had showed him a .22 handgun.

Subsequently Standen sought post-conviction relief, alleging that he had not entered the plea knowingly or understandingly. The same judge who had taken his guilty plea heard this petition and denied it. On appeal, the Supreme Court of Nevada reversed, stating: "It is very clear that Standen's plea was not entered knowingly or understandingly." *Standen v. State*, 99 Nev. 76, 657 P.2d 1159, 1161 (1983). In passing, the court noted that Standen was "an illiterate former mental patient" with a sixth grade education and that the open murder charge did not charge or even mention murder in the first degree. *Id.* 657 P.2d at 1160 nn. 1–2.

Under an amended information Standen was charged with murder with the use of a deadly weapon. On October 18, 1983 he pleaded not guilty. Prior to trial, he moved in limine to exclude evidence of the prior guilty plea. The motion was granted. Trial began July 1984. During the trial his counsel tried to show that the police had acted improperly by prematurely disposing of evidence and not following up leads as to other possible perpetrators. The obvious response to this line of questioning, that Standen had pleaded guilty, was impossible under the court's ruling. After unheeded warnings to defense counsel not to pursue this kind of questioning the trial court admitted evidence of Standen's plea.

Defendant's counsel immediately asked the court to instruct the jury that the plea could

not be considered as evidence. The court responded to this request by stating:

Ladies and Gentlemen, the instruction will be at the close of the trial that you cannot decide this case on the basis of the guilty plea alone.

In other words, you can't say he pled guilty previously, he must be guilty, therefore we're going to find him guilty. You must decide the case on the basis of all the evidence that is presented here in the court. You must consider it all and then decide the case. And you must be convinced, of course, beyond a reasonable doubt.

MR. SEXTON (defense counsel): Your Honor, are you saying then that they can consider this for any purpose at all?

THE COURT: They can consider all the evidence in the case and that happens to be part of the evidence. But they cannot decide that he is guilty on that basis alone.

The defense objected to this instruction.

The defense then called as a witness Fred Atcheson, who had worked on the case in the Public Defender's Office in 1979. On cross-examination, the prosecution asked the following questions and received the following answers:

Q: You are familiar with what a guilty plea is, aren't you?

A: Yes.

Q: And that is the admission of the facts?

A: It's both a waiver of all defects prior to the entry of a plea and it's also the admission as to the essential elements of an indictment or information against a defendant.

The cross-examination went on to bring out that before pleading guilty his counsel had gone over the elements of his case with Standen.

In proposing instructions for the jury at the end of the trial, the defense again asked for an instruction excluding the plea and objected to the instruction the court actually gave. The court told the jury:

You may not find the defendant guilty in this case solely on the ground that he previously pled guilty. You may find the defendant guilty only upon consideration of all the evidence in the case.

The jury was also instructed that any "statement" that the defendant did not make voluntarily must be disregarded. The jury was also told, in a separate instruction, that the Nevada Supreme Court had set aside Standen's plea of guilty "on the ground that the plea was involuntary because he did not understand the nature of the charge against him."

In his closing argument to the jury the prosecutor asked, "What does the guilty plea tell us?" and answered his own question in the person of the defendant: " 'I was aware of the facts'; his attorney was aware of the facts; they discussed it all."

The prosecution's evidence included the facts we have already stated. In addition, Standen's voluntary statement at the Nevada State Prison was introduced, and the state presented Paul Santmeyer as a witness to refute Standen's account of his presence in Reno. Santmeyer testified that he had never been in Nevada before and that he knew Standen only as a fellow inmate of a state school for the retarded in Rome, New York.

Standen was found guilty of first degree murder in violation of Nev.Rev.Stat. § 200.-030 and of committing a murder with the use of a deadly weapon, enhancing his punishment under *id.* 193.165 to a term equal to the term of imprisonment described by the statute for the crime. On August 15, 1984 he was sentenced to two consecutive sentences of life without the possibility of parole.

In a per curiam opinion the Supreme Court of Nevada affirmed. *Standen v. State,* 101 Nev. 725, 710 P.2d 718 (1985). The court, noted that the trial court's instruction on the use of the guilty plea as part of the evidence was erroneous: "A prior guilty plea that has legally been withdrawn or judicially invalidated is deemed never to have existed and should not be used as evidence." *Id.* 710 P.2d at 720. The court very briefly reviewed the evidence against Standen and concluded: "Where there is substantial evidence in the record to support the jury verdict, this Court will not disturb the verdict on appeal." *Id.*

Standen filed a petition for post-conviction relief. It was heard by the same judge who had taken his original guilty plea and who then presided at his trial. The petition was denied. On appeal to the Nevada Supreme Court, Standen represented himself. His appeal was dismissed without opinion, *Standen v. State,* 104 Nev. 873, 809 P.2d 621 (1988).

Standen filed an amended petition for habeas corpus in the federal district court on December 9, 1988. The court denied Standen's request for appointed counsel. On June 7, 1990 a magistrate judge filed a report and recommendation denying the petition. The report and recommendation were adopted by order of the district court in September 1990.

Standen appealed. On December 27, 1991 this court granted Standen a certificate of probable cause. On May 29, 1992 it appointed counsel to represent Standen.

### ANALYSIS

■ A comprehensive search has discovered no case on all fours with this one—no case where a court told a jury that a withdrawn guilty plea was part of the evidence against the defendant. If no such case exists, it is because it contradicts the character of a trial to ask a jury to consider a defendant's guilt in terms of specific testimony and also in terms of his own plea of guilty. A plea of guilty is no "mere admission or an extrajudicial confession; it is itself a conviction. Like a verdict of a jury it is conclusive." *Kercheval v. United States,* 274 U.S. 220, 223, 47 S.Ct. 582, 583, 71 L.Ed. 1009 (1927). A fair trial cannot be had if the jury must weigh with all the other evidence, pro and con, the one overwhelming piece of evidence: the defendant pleaded guilty.

That the tactics of Standen's counsel had provoked the trial court into allowing the plea in evidence, that the court's error can thus be catalogued as invited, does not mitigate what was done. The defendant is bound by his counsel's strategic decisions. *United States v. Martinez,* 883 F.2d 750, 755 (9th Cir.1989), *vacated on other grounds* 928 F.2d 1470 (9th Cir.1991). But counsel's strategy cannot be held to have acted as a waiver of Standen's right to a fair trial by jury, *cf., Carnley v. Cochran,* 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962); and the state does not contend that it does.

Legally, the plea no longer had the effect of a conviction after the Nevada Supreme Court had permitted its withdrawal. The admission of every element of the crime remained, with damning force when the jury was told it could consider the plea as part of the case before it. Standen could not have had a fair trial when his withdrawn plea constituted evidence against him.

■ If the jury put together the instruction that it not consider statements of Standen involuntarily made and the instruction that the Nevada Supreme Court had found his guilty plea to be involuntary, the jury would not have considered the guilty plea at all. But the jury had twice been told by the trial court that the guilty plea was evidence before it. When the trial court gave contradictory instructions, the jury cannot be presumed to have chosen the correct one. *United States v. Panter,* 688 F.2d 268, 270 (5th Cir.1982).

The Supreme Court of the United States has distinguished two kinds of constitutional error in a trial: structural, destructive of such basic elements as an impartial tribunal, public trial, and competent counsel, and those "trial errors" impacting constitutional rights without destroying the trial's structure. *Arizona v. Fulminante,* —— U.S. ——, —— ——, 111 S.Ct. 1246, 1264–65, 113 L.Ed.2d 302 (1991); *Chapman v. California,* 386 U.S. 18, 23 n. 8, 87 S.Ct. 824, 827 n. 8, 17 L.Ed.2d 705 (1967). It is difficult to classify the constitutional error here in terms of these alternatives. The error did not deny Standen an impartial judge and jury, competent counsel, or a public trial. But the error made the presentation of a defense a vain exercise. The error "either aborted the basic trial process, or denied it altogether." *Rose v. Clark,* 478 U.S. 570, 578 n. 6, 106 S.Ct. 3101, 3106 n. 6, 92 L.Ed.2d 460 (1986) (citations omitted). The error effectively destroyed the trial itself. The structure of the trial was undermined as the trial itself became an empty shell.

Considered as a structural error, the admission of, and instructions on, the guilty plea cannot be neutralized by harmless error analysis. *Chapman,* 386 U.S. at 23, 87 S.Ct. at 827. However, structural error may be the wrong classification. *See Fulminante,* —— U.S. at ——, 111 S.Ct. at 1265. Rather, this type of error is more properly characterized as a "trial-type error"—an "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless." *Id.* at ——, 111 S.Ct. at 1264. The improper admission of a guilty plea, like the admission of a coerced confession, is "similar in both degree and kind to the erroneous admission of other types of evidence" and is therefore amenable to harmless-error analysis. *Id.* at ——, 111 S.Ct. at 1265.

Consequently, we apply the test, which is more stringent for the petitioner, appropriate in collateral review of trial error. *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1720, 123 L.Ed.2d 353 (1993). This test is the test originally announced in *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). Under this standard habeas relief must be granted only if the trial error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht,* —— U.S. at ——, 113 S.Ct. at 1711 (quoting *Kotteakos,* 328 U.S. at 776, 66 S.Ct. at 1253). Even on this scale, the verdict in this case cannot be salvaged. The weight of the guilty plea was heavier than all the other pieces of the prosecution's circumstantial case; its admission must have affected the minds of the jurors, short-circuited the process of rational deliberation and been harmful in the sense that it produced the guilty verdict.

The Nevada Supreme Court considered the case as though it were an appeal in which the sufficiency of the evidence for conviction were challenged. The court looked to what evidence supported the conviction apart from the guilty plea erroneously admitted. There is no basis in our law for such a review of constitutional error committed by a state trial court. "There is a striking difference between appellate review to determine whether an error affected a judgment and the usual appellate review to determine whether there is substantial evidence to support a judgment." Roger Traynor, *The Riddle of Harmless Error,* 27 (1970). Review for harmless error "requires the most painstaking examination of the record and the most perceptive reflections as to the probabilities of the effect of error on a reasonable trier of fact." *Id.* at 30. This duty of a meticulous review of the record becomes particularly significant in application of the *Kotteakos* standard. *Brecht,* —— U.S. at ——, 113 S.Ct. at 1722–25. (Stevens, J., concurring).

No doubt the prosecution had a case without the intrusion of the plea. Standen was present at the Holiday Inn, near where Kaylyn Danner was probably abducted, and present at 11:40 p.m., near the probable time of the abduction. Standen was present at Sierra Sid's, not far from where her body was found, and present at 12:20 p.m., a time arguably close to the time the murder occurred, although in fact there is no evidence as to the hour of death of Kaylyn Danner. Standen went from the casino to the truck stop for no apparent reason and then called a taxi to take him back to the city he had just left. Standen apparently discarded his coat on a winter's night between the time he was seen in Reno and the time he was seen in Sparks. Standen lost his logbook, he thought at Sierra Sid's, and it was found not far from where Kaylyn Danner's body was found. Her car was parked at Sierra Sid's. He denied being at Sierra Sid's. He said he knew who the murderer was, and he alluded to an old acquaintance as being in his company in the days after the murder. His blood type was consistent with the semen found in Kaylyn Danner's vagina, and his hairs were consistent with those found on her clothes.

The defense argued that Standen did not have time to commit the crime. If Kaylyn Danner entered the parking lot at the Monte Carlo Casino at 11:47 p.m. and was immediately abducted, Standen had approximately 33 minutes to do the deed—that is, on the assumption that Standen was the murderer, he had 33 minutes to commit the murder

between the time of abduction and his appearance at Sierra Sid's at 12:20 a.m. The driving time, calculated by a police officer driving at the speed limit, was 12 minutes from the casino to where the body was found, 5 minutes from there to Sierra Sid's. That left 16 minutes for the abduction, the fight with the victim, the knifing, and disposing of his coat and any other bloody garments (none of which were ever found)—a short time but arguably enough.

This evidence did not prove that Standen inflicted the fatal blows unless it is assumed that he acted alone. The state conceded that it could "not exclude" the possibility that another was involved. The assumption that Standen was alone was not supported by the evidence and indeed appears contrary to such clues as the speed with which the abduction was carried out; the use of a local backroad turnoff by a person who would not have known the local roads; Standen's looking for someone else at Sierra Sid's; his rapid and effective disposal of a presumably bloodstained overcoat; his close association with another person in leaving Reno in the days immediately following the murder, the person with whom he shared the use of Larry Mattson's credit card; and Standen's own claim that another man was the one they were looking for.

That Standen said, after he was arrested for murder, that the wanted man was the one who had signed Mattson's credit card, and that after his own guilty plea Standen supplied the name of "Ron," does not confirm Standen's guilt. He had spent much of his life in institutions of the state and knew the harsh rule governing informers, so, as he told the police, he would not be a snitch. Caught by conflicting compulsions from his past, he dredged up one name (Santmeyer) he thought innocuous and gave it, and he gave the name of the murderer "Ron" without enough information to identify him. His lie caused Paul Santmeyer trouble but it did not identify the man who may have participated in the kidnapping and murder.

It is possible that the state might have proved Standen guilty of felony-murder. The state did not prove rape. The state explicitly disavowed seeking to prove homicide in the course of a robbery. But the state did produce enough evidence to make the conclusion irresistible that Kaylyn Danner was kidnapped. Death was inflicted in the course of the kidnapping. If Standen was involved in the kidnapping, he could be proved guilty of felony-murder. *Payne v. State*, 81 Nev. 503, 406 P.2d 922 (1965). Felony-murder is first degree murder under Nev.Rev.Stat. 200.030. The jury was instructed on the elements of felony murder.

The indictment of Standen, however, did not charge felony murder, but read as follows:

> MURDER WITH THE USE OF A DEADLY WEAPON, a violation of NRS 200.010, NRS 200.030, and NRS 193.165, a felony, in the manner following:

> That the defendant in the late evening hours of the 31st day of January A.D.1978, and the early morning hours of the 1st day of February A.D.1978, or thereabout, and before the filing of the Amended Information, at and within the County of Washoe, State of Nevada, did willfully, unlawfully, and with malice aforethought, deliberation, and premeditation, kill and murder KAYLYN DANNER, a human being, in the following manner, to wit: That the defendant did abduct, kidnap, sexually assault, batter, and stab the said KAYLYN DANNER in Washoe County, Nevada, which stabbing with the use of a deadly weapon caused the death of KAYLYN DANNER during the same period of time.

The charged crime was the actual killing of Kaylyn Danner.

The jury found Standen guilty of using a deadly weapon in the stabbing of Kaylyn Danner—a conclusion that indicates beyond doubt that the jury supposed that the evidence before it established that Standen was the killer. The verdict excludes the possibility that Standen was convicted of felony murder. While the evidence apart from his withdrawn plea might have shown him guilty of felony murder, the convergent circumstances pointed to by the prosecution did not show beyond a reasonable doubt that Standen was the killer, unless they were substantially helped by the plea of guilty.

Without the guilty plea there were several substantial problems with the state's case:

*First,* Standen's absence of motive. No certain evidence of rape was produced. Rather, there is the suggestion of a set-up—the victim's pants, pantyhose, panties removed and put in the back of the car, the boots that must have come off first left near the body; sexual assault intimated.

If rape was not Standen's motive, robbery is also eliminated. He already had access to Mattson's credit card—credit enough to live on. He could not use Danner's and her card disappeared from her purse never to be used again. She was a woman struggling to make a living, no person to rob. The state did not even charge robbery.

If not to rape or rob, why kidnap and kill? That there were those who might have had motive to do so was hinted at by the defense; it was not the defense's job to convict some other suspect. Although a vicious psychopath may need no rational motive, the failure to show a motive weakens the state's case. And the extraordinary violence with which Kaylyn Danner's life was ended points to a murderer absolutely intent on assuring her death, a person apparently different from the hapless, motiveless drifter, Warren Standen. Such a conclusion, if far from certain, is one that a jury that had not been substantially affected by Standen's withdrawn guilty plea might have reached.

*Second,* that the logbook was lost by Standen, not planted by perpetrators who set him up. That a man bent on kidnapping should carry his logbook with him, having already stored somewhere else his other gear, seems unlikely; that the logbook containing business entries from a much earlier date should have been needed by him that night is curious; that Kaylyn Danner could have opened a car window and thrown it out or that she would have possessed it after she had been dragged bleeding from the car seems improbable; that the logbook should turn up, unbloodied and unscuffed, on a road that good police work would be likely to search is surprising; that Standen would be looking for the logbook at Sierra Sid's suggests that he had turned it over to another who said it would be left for him there or that he, the possessor of the logbook, would meet Standen there; that Standen had reason to believe he would be met there is suggested by his failure to keep the cab he had ordered; that the book had no readable fingerprints suggests that whoever placed it wanted Standen's name to appear but nothing that would connect it with its last possessor. The police treated the logbook as a heaven-sent clue. But a jury uninfluenced by the guilty plea could well have suspected that the clue was placed there by a less than heavenly agency.

*Third,* Standen's failure to flee. Standen remained in Reno for three days after the murder. He did so sharing the benefits of a stolen credit card. He then embarked on an expedition that left a paper trail. A man guilty of murder must have been afraid of staying in the city of the murder and been afraid of being tracked in the days following the murder.

Standen's failure to flee converges with his conduct at the time when, according to the state, he had just finished completing a brutal, bloody murder. That there had been a real fight by Kaylyn Danner was undeniable—the blood within the car, on the window, on the windowscraper showed that she had been knifed inside the auto; the key clutched in her hand was a defensive weapon; the abrasions on her hands showed, in the medical examiner's opinion, that she had sought to ward off the blows; that the car's domelight's cover had been broken off indicated that in resisting she was able to move to some degree; there was blood on the hood showing that she continued to bleed after being dragged from the car. It is scarcely credible that the man who killed her had no blood on his clothes. It is barely possible that the man who had just killed her would strike two witnesses as neat, well-groomed, composed only a few minutes after the struggle. It is hardly believable that the assailant in such a bloody business would not try to conceal his face from a cabdriver or that he would inquire boldly in a small truck stop about a document tied to him. Standen's conduct does not show consciousness of guilt of a capital crime. Or so at least a jury not injuriously and substantially contaminated by

the guilty plea in evidence might have concluded.

A defendant without proven motive; a defendant whose conduct on the night of, and the days following, the murder showed no fear of identification or arrest; a defendant, stranger to the town, simpleminded enough to have been set up by those who may have had a deep interest in Kaylyn Danner's death—could a jury find the evidence convincing beyond a reasonable doubt without the powerful assistance of the plea?

After a thorough review of the record we are convinced that the use of the guilty plea as evidence had substantial and injurious effect or influence in determining the jury's verdict.

REVERSED. The district court is ordered to issue the writ sixty days from the issuance of the mandate, unless within that time the State of Nevada indicates to the district court its intention to re-try Standen. In that event, the district court shall order Standen released to the proper authorities for the purposes of re-trial.

T.G. NELSON, Circuit Judge, Concurring:

I concur in Judge Noonan's analysis and in most of his opinion. I write separately only on two matters.

First, my reading of the cold record left me with an abiding belief in Warren Standen's guilt. The facts which led me to this conclusion are set out in Judge Noonan's opinion, and need not be marshaled here again. However, the jury is the body whose conclusion matters, and its verdict was tainted by a trial error unique in the history of the common law. Regardless of my view of his guilt, Standen was entitled to a trial at which the jury could fairly weigh all the evidence, a function denied to it by admission of evidence that Standen had previously pleaded guilty.

Second, the State of Nevada is now faced with the practical problem of trying to assemble a new trial fifteen years after the crime was committed. The prosecution, defense counsel and the trial judge make up the first line of defense established by our system for the protection of an accused's rights.

Their failures in Standen's case were basic and repeated. However, when the Nevada Supreme Court had the chance to correct the error in 1985, it applied the wrong test. There *was* substantial evidence to support the verdict. Unfortunately, this was not the question which was posed by Standen, but it was the one which that Court answered.

No one's interests, whether the public's or Standen's, have been served in this case. We can hope we have all learned from it.