IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38840-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SCOTT EUGENE RIDGLEY, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, J. — We previously remanded this case for the trial court to determine whether improperly obtained video recordings affected the outcome of Scott Ridgley's trial.[1] On remand, the trial court determined that the recordings did not affect the decision of the magistrate to issue a warrant for Ridgley's property and that any error in admitting the recordings at Ridgley's trial was harmless.

In this second appeal, Ridgley argues that the trial court applied the wrong standard to reach its result. We agree. With respect to the search warrant, we conclude that the error was harmless because there was sufficient independent evidence to support the officer's decision to seek the warrant and the magistrate's decision to issue the warrant.

---

[1] *See State v. Ridgley*, 17 Wn. App. 2d 846, 488 P.3d 864 (2021).

We reach a different conclusion with respect to the trial. At trial, the recordings were a central part of the State's evidence and substantiated the disputable testimony of the informant. We conclude that there is a reasonable probability that admission of the recordings materially affected the outcome of the trial and the error was not harmless. Accordingly, we reverse the trial court's decision in part, vacate Ridgley's convictions, and remand for further proceedings.

## BACKGROUND

1. ALLEGATIONS

The Joint Narcotics Enforcement Team (JNET) for Lewis County arranged for a confidential informant to purchase controlled substances from Ridgley.[2] The controlled buys were conducted on Ridgley's property in rural Lewis County. The property contained two separate residences with separate addresses: the 509 and 517 residences. The 509 residence was larger and included a shop. The 517 residence, where Ridgley lived, was smaller.

Law enforcement officers instructed the informant to conduct two controlled buys from Ridgley about one week apart. During both buys, the informant wore a video and audio wire that provided a live feed and recording of the informant's actions. After each buy, the informant turned over methamphetamine to law enforcement.

---

[2] Unless otherwise noted, "RP" refers to the verbatim report of proceedings from Ridgley's trial. The start date of that volume is July 29, 2019.

After the controlled buys were completed, law enforcement sought a warrant to search Ridgley's residences. The search warrant declaration included an account of what the officer had witnessed on the live feed during the first controlled buy. The declaration also contained the informant's account of how Ridgley had sold him drugs during the controlled buys. In addition, the declaration contained information on reports from several other individuals who had claimed that Ridgley had previously sold them drugs or reported that Ridgley was selling drugs. Finally, the declaration included Ridgley's criminal history, noting that he had seven prior felony convictions for narcotic-related crimes. Nothing in the declaration suggested that the recordings were attached or otherwise included in the warrant request.

The magistrate granted the search warrant, and law enforcement executed a search on both residences. During the search, law enforcement located a black plastic box containing methamphetamine, cash, and a scale.

The State charged Ridgley with two counts of delivery of a controlled substance, one count of possession of a controlled substance with intent to deliver, one count of maintaining a premises or vehicle for using controlled substances, and one count of unlawful possession of a firearm.

2. TRIAL

At trial, the State used the recordings to support all of the charges against Ridgley with the exception of the possession of a firearm charge.

3

*Confidential Informant's Testimony*

Independent of the recordings, the informant testified that during each of the controlled buys, he purchased one ounce of methamphetamine. After the State played the recording from the first controlled buy, the informant testified about that buy. He stated that the transaction occurred in Ridgley's house, the 517 residence. He explained that Ridgley had retrieved the methamphetamine from a black plastic box and handed it to him. Following the buy, the informant met law enforcement at a predetermined location and turned over the drugs.

After the State played the recordings from the second controlled buy, the informant testified about the second transaction. He testified that the second buy occurred in the same manner as the first and that he again left and met law enforcement at a predetermined location.

The informant testified that other individuals were present on the property during both buys. The informant also testified that police searched him and his vehicle before and after both buys.

In addition to the controlled buys, the informant said that he had been to Ridgley's home the week before the first controlled buy and had seen controlled substances at the property. He also said that while he was there he had seen a firearm lying on a table near Ridgley.

During defense counsel's cross-examination of the informant, counsel replayed the recordings from the controlled buys and the informant pointed out precisely where, in each recording, Ridgley handed him methamphetamine.

*Police Testimony*

Detective Chad Withrow testified regarding the controlled buys with the confidential informant. He said the informant had agreed to work, and in exchange, "instead of getting charged for . . . three deliveries, he'd take possession charges instead and not go to prison." Rep. of Proc. (RP) at 68.

Detective Withrow went over the process used for conducting controlled buys. He explained that police conduct a strip search of the informant and a thorough search of the informant's vehicle immediately before and after the controlled buys. These searches allowed police to corroborate what happened during the controlled buy. Detective Withrow testified that he found nothing on the informant during either of the searches.

Detectives Withrow and Robin Holt conducted surveillance of the informant during the buys. However, they lost physical sight of the informant before he arrived at Ridgley's property and relied on the live feed[3] to know what was going on.

---

[3] During the controlled buys, the officers watched the video on the informant in real-time. During trial, they testified as to what they observed on the live feed during the controlled buys. The live feed video was played during the trial.

Detectives Mathew Schlecht and Adam Haggerty[4] were part of a second surveillance team near Ridgley's property. They testified that they could see the informant arrive at Ridgley's property in his car but, beyond that, relied on the live feed to know what was going on.

Detective Schlecht testified about what he witnessed on the live feed during the first controlled buy. Detective Withrow similarly testified as to what he had observed via the live feed during and after both of the controlled buys.

Testimony from law enforcement explained that the informant purchased the methamphetamine with money provided to him by law enforcement. This allowed law enforcement to track the money if it was later recovered. The State presented photocopies of the buy money, taken prior to the controlled buys, given to the informant prior to purchasing the methamphetamine.

Law enforcement testified that when they executed the search warrant on Ridgley's property the day after the second controlled buy, Ridgley was standing outside with another man and other people were on the property. Detective Haggerty testified that during the search, officers encountered Ridgley's son, Larry Ridgley, in the shop next to the 509 residence. He also said that police recovered a black plastic box "right where Mr. Ridgley was standing." RP at 255. However, as Detective Haggerty was discussing both Scott Ridgley and Larry Ridgley in this portion of his testimony, it is

---

[4] Detective Haggerty was only involved in the first controlled buy.

unclear to whom he was referring when he said "Mr. Ridgley."[5]  The box contained over $6,000 in cash, a scale, and suspected methamphetamine.

While searching Ridgley's 517 residence, an officer testified that a dismantled gun was found in what appeared to be the dining room.  Officer Curtright stated that he had seen a target with bullet holes in it out the back window of the 517 residence.  Detective Schlecht testified that the firearm was reassembled and "test-fired" and it functioned properly.

Detective Withrow testified that during the search, the officers recovered money from both of the controlled buys.  He said that a $10 bill was found on Ridgley's person. The State presented photos of the buy money recovered from the box.  The State also produced a photo of a $10 bill found on Ridgley, but there is no evidence that this particular $10 bill was part of the buy money.  The State did not present any photos of the buy money found on Ridgley.

On cross-examination, Detective Withrow admitted that he did not personally recover any buy money from either of the buys and that no photos were taken of the buy money recovered on Ridgley.  He testified that none of the buy money was retained as it had been returned to the JNET fund.

---

[5] The State admitted in closing argument that Scott Ridgley was not in the shop where the box containing the drugs was discovered when police executed their search of the 509 residence.

*Closing Argument and Jury Verdict*

The State repeatedly emphasized and relied on the recordings during its closing

argument. The State argued that the recording device provided clear evidence of what

occurred while the informant was on Ridgley's property:

> [W]hat we have is what was shown on the recording and in the testimony
> was that [the confidential informant] exited his car, didn't contact anyone
> other than Mr. Ridgley who's the defendant and he identified him in court.
> . . . .
> So you saw the video and you heard testimony about what Mr.
> Ridgley did during this controlled buy.
> . . . .
> And so on both occasions [the confidential informant] and Mr.
> Ridgley make their way into 517. And on both occasions you can see Mr.
> Ridgley pull out a large ["baggie"] containing a large amount of crystal
> substance. One video admittedly has more detail than the other and that
> will be the first video. But he's basically going through the same motions
> on the first video and the second video. But you can see him breaking up
> the item inside the large bag, sticks a little scooper in there, pours it on a
> scale, dusts some off, gets the amount that [the confidential informant] said
> he requested which was an ounce. Mr. Ridgley puts the item in a plastic
> bag. And you can see the plastic bag. He holds it up. [The confidential
> informant] hands Mr. Ridgley the money, $500 on the first occasion, $450
> on the second occasion, and in each instance Mr. Ridgley hands [the
> confidential informant] the substance.

RP at 327-28. The State also argued that there was no room for reasonable doubt

concerning the delivery charges in light of the video evidence:

> [I]t reminded me of the saying don't believe your lying eyes. You saw the video. You saw what happened. He delivered controlled substances to [the confidential informant].

RP at 332.

While acknowledging that Ridgley was not found in actual possession of the drugs and gun at the time of the search, the State argued that he was in constructive possession.

In light of the video evidence presented by the State, defense counsel conceded the controlled substances charges and focused on the firearm charge:

> I'm only going to argue to you about one count and that's Count IV. I don't know if you—not that you know me, but I don't know if you would have honestly have [sic] any respect for me as a defense attorney if I were to try to come here and argue to you Counts I, II, III, and V as far as the evidence. I think the evidence was probably pretty clear as far as what went on, so I'm not going to argue to you about those. But I am going to argue to you about Count IV and that's unlawful possession of a firearm.

RP at 345.

The jury found Ridgley guilty on both counts of delivery of a controlled substance, possession of a controlled substance with intent to deliver, and maintaining a premises or vehicle for using controlled substances. But the jury acquitted Ridgley of first degree unlawful possession of a firearm.

*Appeal and Remand*[6]

Ridgley appealed. While acknowledging that the officers made a genuine effort to comply, we determined that the authorization report used to support the undercover recording of the controlled buys failed to meet the strict requirements of Washington's privacy act, chapter 9.73 RCW. Accordingly, we concluded that evidence obtained from the live feed and recordings of the controlled buys was inadmissible. We remanded so the trial court could assess the impact of the improperly admitted evidence on the search warrant and trial.

On remand, the State argued that the recording did not have a material effect on the magistrate's decision to issue the warrant or Ridgley's trial. Specifically, the State pointed out that the magistrate did not view the recordings before issuing the warrant. Moreover, at trial, the untainted testimonies of Detective Withrow, the informant, and the other JNET members who were present during the controlled buy procedures supported Ridgley's convictions. The State commented that Ridgley did not meaningfully challenge the informant's credibility. Finally, the State maintained that the informant's testimony based on his recollection of what occurred was "sufficient" and therefore any error was harmless.

---

[6] Unless otherwise noted, the facts in this section are contained in the opinion from Ridgley's first appeal. *Ridgley*, 17 Wn. App. 2d 846.

Defense counsel, on the other hand, argued that the recordings served to essentially vouch for the confidential informant's credibility. Counsel noted that there were "additional individuals present at . . . the two houses," and the case involved two residences. Finally, counsel pointed out that, absent the recordings, the case essentially came down to a question of the informant's credibility because law enforcement could not testify as to what occurred inside the house. Accordingly, counsel maintained that the presentation of the recording was prejudicial.

The trial court found that admission of the recordings at trial was harmless error, stating:

> All evidence is prejudicial to some extent. The question is, was it such in this case that it prevented Mr. Ridgley from receiving a fair trial.
>
> The confidential informant did testify, the officers testified about the setup, the going in, the coming out. And I think one of the important pieces in this is that they kept track of the bills that were used during the buy, and Mr. Ridgley had at least one of those on his person later on.
>
> So all of that, I think there was substantial evidence here in this case that supported the finding of guilt. And I think even without that video there was substantial evidence.

RP (Nov. 30, 2021) at 7-8.

With respect to the search warrant, the trial court found that the informant's account from the controlled buys alone was "substantial." The trial court also determined that the magistrate did not observe the recording and the probable cause determination was "based on the testimony of the [confidential informant] as related through the

11

officers." RP (Nov. 30, 2019) at 8-9. Accordingly, the trial court found that the

"existence of the video did not impact the propriety of the warrant that was issued." RP

(Nov. 30, 2019) at 9. The trial court entered findings of fact and conclusions of law

reflecting its decision:

> 1.1 The confidential informant testified.
>
> 1.2 The law enforcement officers testified regarding the set up to the controlled buy, the confidential informant going into Ridgley's residence, and the confidential informant coming out of Ridgley's residence.
>
> 1.3 The law enforcement officers kept track of the money (buy money) used to purchase the controlled substances from Ridgley.
>
> 1.4 Ridgley was found with buy money, at least one bill, on his person when he was contacted at a later time.
>
> 1.5 In the application for the search warrant, there is a [declaration] that sets out the procedures that were used by law enforcement. In this case, about the search of the confidential informant prior to the controlled buy. The confidential informant goes in, comes back out, reports what he did to the officers, he gave the money, received the drugs, is searched again.
>
> 1.6 The magistrate did not observe the video.
>
> . . . .
>
> 2.1 The admission of the improperly admitted self-authorizing video recording in Ridgley's jury trial was harmless.
>
> 2.2 There was substantial evidence presented without the video, therefore the result of the trial would not have been different if the video or evidence referring to the video had not been admitted.
>
> 2.3 The existence of the video did not impact the propriety of the search warrant that was issued.

CP at 40-41.

Ridgley appeals.

ANALYSIS

1.    SEARCH WARRANT

Ridgley argues that the trial court erred in finding that the tainted recordings did

not affect the issuance of the search warrant as the State did not meet its burden to show

that the independent source exception applied.  We determine that the trial court failed to

consider the issue under the correct legal standard but that the trial court's failure to apply

the proper standard to the search warrant was harmless error.

A trial court's conclusions of law regarding suppression of evidence are reviewed

de novo.  *State v. Fry*, 168 Wn.2d 1, 5, 228 P.3d 1 (2010).  Unchallenged findings of

facts are considered verities on appeal.  *State v. Brockob*, 159 Wn.2d 311, 343, 150 P.3d

59 (2006).  A trial court's findings of fact to which an appellant assigns error are

reviewed for substantial evidence.  *Id*.  "Substantial evidence is evidence sufficient to

persuade a fair-minded, rational person of the finding's truth."  *State v. Pratt*, 11 Wn.

App. 2d 450, 457, 454 P.3d 875 (2019).

Under the Fourth Amendment of the United States Constitution and article I,

section 7 of the Washington Constitution, the issuance of a search warrant requires a

showing of probable cause.  *Fry*, 168 Wn.2d at 5.  Probable cause is a fact-specific

determination that requires considerations of the competing interest of enforcement of the

law and protection of an individual's privacy rights.  *Id*. at 6.  "'Probable cause exists

where there are facts and circumstances sufficient to establish a reasonable inference that the defendant is involved in criminal activity and that evidence of the criminal activity can be found at the place to be searched.'" *Id.* (quoting *State v. Maddox*, 152 Wn.2d 499, 505, 98 P.3d 1199 (2004)). "Probable cause requires a probability of criminal activity, not a prima facie showing of criminal activity." *Maddox*, 152 Wn.2d at 510.

Under the exclusionary rule, evidence obtained from an illegal search and seizure must generally be suppressed. *State v. Betancourth*, 190 Wn.2d 357, 364, 413 P.3d 566 (2018). However, there is an exception to this rule referred to as the independent source exception." *State v. Gaines*, 154 Wn.2d 711, 718, 116 P.3d 993 (2005). Under this exception, "evidence tainted by unlawful governmental action is not subject to suppression under the exclusionary rule, provided that it ultimately is obtained pursuant to a valid warrant or other lawful means independent of the unlawful action." *Id*. "Furthermore, the inclusion of illegally obtained information in a warrant [declaration] does not render the warrant *per se* invalid, provided that the [declaration] contains facts independent of the illegally obtained information sufficient to give rise to probable cause." *Id*.

To determine whether the challenged evidence should be admitted under the independent source exception, courts examine whether the "illegally obtained information affected (1) the magistrate's decision to issue the warrant or (2) the decision of the state agents to seek the warrant." *Betancourth*, 190 Wn.2d at 365. If neither the

issuance of the warrant nor the decision to request the warrant were affected by the illegally obtained information, the evidence is admissible under the independent source exception. *Betancourth*, 190 Wn.2d at 365. If a probable cause declaration "'contains sufficient facts to establish probable cause independent of the illegally obtained information,'" the independent source doctrine applies. *Gaines*, 154 Wn.2d at 719 (quoting *State v. Coates*, 107 Wn.2d 882, 887, 735 P.2d 64 (1987)).

The burden is on the State to prove that the error was harmless because an exception to the exclusionary rule applies under which the evidence is admissible. *See State v. Mayfield*, 192 Wn.2d 871, 898, 434 P.3d 58 (2019) (State bears burden of proving that evidence is admissible under attenuation doctrine where evidence was obtained in violation of article I, § 7); *State v. Watt*, 160 Wn.2d 626, 635, 160 P.3d 640 (2007).

Here, the trial court determined that since the magistrate who issued the warrant had not actually viewed the recordings, the existence of the video did not impact the propriety of the search warrant. But the trial court failed to consider whether the contents of the recording affected either the magistrate's decision to issue the warrant or law enforcement's decision to request the warrant. Accordingly, the trial court erred in determining that any error involving the recordings was harmless as it pertains to the search warrant because it failed to apply the correct standard. Nevertheless, upon

application of the correct standard, we conclude that the independent source exception

applies and the error was harmless.

Application of the harmless error analysis to a search warrant declaration is a two-

part process. First, we consider whether the recordings affected the magistrate's decision

to issue the warrant. The trial court found that the magistrate did not view the recordings,

but Ridgley asserts that there is nothing supporting this finding. When making a

probable cause determination, trial courts are required to preserve the evidence used in

support of probable cause and make a record of any "additional evidence" the trial court

relied on in finding probable cause. CrR 2.3(c).

Here, nothing in the declaration suggests that the recordings were included with

the warrant request. Moreover, in granting the warrant, the magistrate did not state that it

relied on any evidence outside of the declaration. Because there is nothing in the record

indicating the magistrate viewed the recordings in making its probable cause finding, it

was reasonable for the trial court to find that the magistrate did not view the recordings.

Accordingly, the trial court's finding that the magistrate did not observe the recordings is

supported by substantial evidence.

Even though there is no evidence the magistrate viewed the recordings, the search

warrant declaration did contain a description of what the officer had viewed in the

recording during the first controlled buy. The trial court did not consider the impact of

this account on the magistrate's decision. However, this description occupied less than a

paragraph of the declaration that spanned nine pages. Most of the information in the declaration did not relate to the recordings. The declaration relayed the informant's account to police of what had occurred during the controlled buys and the officer's account of how the informant and his car had been searched before and after both controlled buys. The declaration contained information regarding reports from several other individuals who had claimed that Ridgley had previously sold them drugs or reported that Ridgley was selling drugs. Additionally, the declaration informed the magistrate that Ridgley had several prior felony convictions for narcotics-related crimes.

Second, we address whether the recordings affected law enforcement's decision to seek the warrant. As explained above, law enforcement had significant evidence that Ridgley was selling drugs from the controlled buys to the testimonies of several other individuals that he had sold them drugs. Because the declaration contained sufficient information to show probable cause absent the illegally obtained information, law enforcement would have still sought the warrant even if they had not obtained the recordings from the controlled buys.

The testimony of the informant, along with the additional corroboration from police and other persons who had reported Ridgley's activities and Ridgley's criminal history, provided sufficient evidence to show that Ridgley was involved in criminal activity and that evidence related to the criminal activity would be found at the property. Accordingly, the declaration contained sufficient facts independent of the tainted

recordings to establish probable cause. Because the evidence was admissible under the independent source doctrine, the trial court's failure to apply the correct legal standard was harmless.

2.      ADMISSION OF RECORDINGS AT TRIAL

Ridgley also challenges the trial court's conclusion that admission of the tainted recordings at trial was harmless. Again, he contends that the trial court applied the wrong standard. Rather than apply the "materially affected" standard, Ridgley argues that the court applied the "substantial evidence" standard. We agree that the court applied the wrong standard and that this error was not harmless.

A nonconstitutional evidentiary error is reviewed for harmless error, which asks whether the error in admission of the evidence was prejudicial. *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). "'[E]rror is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.'" *Id.* (quoting *State v. Tharp*, 96 Wn.2d 591, 599, 637 P.2d 961 (1981)). Improper admission of evidence is harmless error "if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole." *Bourgeois*, 133 Wn.2d at 403. This determination is made by measuring the admissible evidence of guilt against any prejudice caused by the inadmissible evidence. *Id.* The burden is on the defendant to show that the error was not harmless. *State v. Barry*, 183 Wn.2d 297, 317-18, 352 P.3d 161 (2015).

18

Our Supreme Court recently clarified the difference between the substantial evidence and the materially affected standards, stating that "'[t]here is a striking difference between appellate review to determine whether an error affected a judgment and . . . appellate review to determine whether there is substantial evidence to support a judgment." *In re Dependency of A.C.*, No. 100966-6, slip op. at 8 (Wash. Mar. 9, 2023) www.courts.wa.gov/opinions/pdf/1009666.pdf (internal quotation marks omitted) (quoting *Standen v. Whitley*, 994 F.2d 1417, 1423 (9th Cir. 1993)). Courts will affirm under the substantial evidence standard where findings are supported by substantial evidence. *A.C.*, slip op. at 9. This standard generally applies to sufficiency of the evidence issues, but may also be helpful where "the trial court erred in admitting a piece of evidence, but that evidence is minor in light of all the properly admitted evidence." *Id.* "In such cases, courts will affirm if the overwhelming untainted evidence would sustain the finding." *Id.* In contrast, under the "materially affected" standard, which is used to determine whether the erroneous admission of evidence was harmless, "'[t]he improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole.'" *Id.* at 10 (quoting *Bourgeois*, 133 Wn.2d at 403).

Here, again, the trial court failed to consider the proper standard on remand. It made no determination on whether there was a reasonable probability that the outcome would have been different absent the admission of the recordings. Although the State

explained the harmless error analysis in its briefing, the trial court focused in on the fact that there was still "substantial" evidence for the jury to find Ridgley guilty absent the recordings. But substantial evidence is not the standard of review for a harmless error analysis, especially where the erroneously admitted evidence was a significant part of the case and most of the State's evidence, including the informant's testimony, referenced the tainted evidence. Instead, the trial court should have considered whether the erroneous admission of the evidence materially affected Ridgley's trial.

Having determined that the trial court abused its discretion by applying the wrong standard, we consider whether the trial court's error was harmless. Initially, we note that Ridgley assigns error to two of the trial court's findings used to support its conclusion. We review the challenged findings for substantial evidence. *Brockob*, 159 Wn.2d at 343. "Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the finding's truth." *Pratt*, 11 Wn. App. 2d at 457.

Ridgley argues, and the State concedes, that the trial court's finding that the officers observed, without the aid of the recording, the informant enter the residence is false. To the contrary, the officers testified that they were unable to observe the informant enter the residence and instead relied on the recording. We accept the State's concession and determine that there was not substantial evidence to support this finding of fact.

Ridgley also argues that the trial court's finding that he was found with buy money on his person is unsupported. The only evidence that Ridgley was found with buy money on his person was provided by Detective Withrow who testified that another officer had found buy money on Ridgley. Detective Withrow did not explain the basis of his knowledge and admitted that he did not actually recover the buy money from Ridgley. None of the buy money allegedly recovered on Ridgley was presented at trial—instead the State presented a bill recovered on Ridgley that was not buy money.[7] We conclude that Detective Withrow's hearsay statement was insufficient to support the trial court's finding that Ridgley was found with buy money on his person.

Without the two previously discussed findings of fact, the only findings from the trial court in support of its decision are the findings that "[t]he confidential informant testified" and "law enforcement officers testified regarding the set up to the controlled buy, the confidential informant going into Ridgley's residence, and the confidential informant coming out of Ridgley's residence." CP at 40. As explained below, these findings are insufficient because they fail to address the core issues in the harmless error analysis.

The State's case centered on the recordings. The recordings were played twice during Ridgley's trial and their content was recounted multiple times in law enforcement's testimony. The recordings showed Ridgley selling methamphetamine to

---

[7] The purpose of the admission of this piece of evidence was unclear.

the informant and provided irrefutable corroboration of the informant's testimony. The importance of the recordings to the State's case is evidenced by the State's emphasis on them during closing argument. It argued to the jury that there was no room to find a reasonable doubt with regard to the delivery convictions because each of the jurors had been able to see the acts with their own eyes. Moreover, the evidence in the recordings formed a basis for the other narcotics related offenses.

Without the recordings, the State's case against Ridgley depends entirely on the informant's credibility. Generally speaking, the use of informants raises "'serious questions of credibility.'" *Banks v. Dretke*, 540 U.S. 668, 701, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004) (quoting *On Lee v. United States*, 343 U.S. 747, 757, 72 S. Ct. 967, 96 L. Ed. 1270 (1952)). "By definition, criminal informants are cut from untrustworthy cloth and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom." *U.S. v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993).

In this case, the significant reduction in charges provided a substantial reason to question the informant's credibility. Nevertheless, because the jury was able to view the recordings, the informant's credibility was not an issue. In closing, defense counsel stated that he would only offer an argument about the firearm charge because the evidence was clear on the other charges. Because the State used the recordings to bolster

the credibility of its central witness, the admission of the recordings cannot be said to be of minor significance.

The jury's verdicts also suggest the materiality of the recordings to their decision. The jury acquitted Ridgley of unlawful possession of a firearm. The only evidence of this charge came from the testimony of the informant and the officers; there was nothing in the recordings to support this charge.

The State argues that the corroborating testimony of law enforcement was sufficient to correct any credibility issues with regard to the informant. Although police offered corroborating testimony, without the recordings, the only evidence about what actually happened during the controlled buys would have been the informant's testimony. Police testimony established that the informant had purchased methamphetamine on the property. But absent the recording, the only evidence directly tying Ridgley to the sale and possession of the methamphetamine was the informant's testimony which, as explained above, was questionable. Had the State not had the aid of the recordings, it is reasonably probable, given the jury's verdict with regard to the firearm charge, that the jury may have determined that the testimony of the informant and law enforcement alone was insufficient to convict Ridgley of the narcotics-related charges.

Without the recordings, the State's case against Ridgley would have come down to the informant's credibility. As the recordings were central to the State's case, it materially affected Ridgley's trial. Moreover, the fact that the jury acquitted on the only

23

charge unsupported by the recordings makes it reasonably probable that they would have acquitted on the other charges without the video evidence. We determine that the error in admitting the recordings was not harmless and accordingly reverse Ridgley's convictions and remand for further proceedings.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Pennell, J.

_____
Siddoway, J.